[No. 15122. Department One. April 7, 1919.]

SCHWAGER-NETTLETON MILLS, *Appellant*, v.
IDA L. CARSTENS *et al., as Executors
etc., Respondents*, CENTRAL REALTY
COMPANY *et al., Defendants.*[1]

MECHANICS' LIENS (81, 94)—DEFENSES—OVERPAYMENTS—EVIDENCE
—SUFFICIENCY. In an action to foreclose a mechanics' lien, the evidence is insufficient to establish overcharges and overpayments, where it appears from the books, slips and checks, that the plaintiff furnished only the material ordered, sold it at usual prices, and furnished bills therefor within ten days, to the knowledge of the owner's confidential secretary.

Appeal from a judgment of the superior court for King county, Alston, J., entered April 25, 1918, upon findings in favor of the defendants, in an action to foreclose a materialman's lien, tried to the court. Reversed.

*Jay C. Allen*, for appellant.
*Edwin H. Flick*, for respondents Carstens.

MITCHELL, J.—This action was brought by Schwager-Nettleton Mills, a corporation, to foreclose a materialman's lien upon real property. There was judgment against plaintiff, from which this appeal is prosecuted.

Ernest Carstens and Ida L. Carstens were husband and wife. On May 14, 1916, he died testate. His will, nominating Ida L. Carstens and Julius A. Carstens as executrix and executor, was promptly admitted to probate in the superior court of King county, and the persons so nominated were appointed executrix and executor of the will, qualified, and since have been acting as such. Ernest Carstens and wife, being the

[1]Reported in 180 Pac. 137.

owners of the real property involved, entered into a written contract, prior to January 22, 1916, with the defendant Central Realty Company, a corporation engaged in the contracting business, whereby the Central Realty Company, as their agents for the supervision and construction of the building, would erect for them, on certain terms and conditions expressed in the contract, an apartment house, herein spoken of as the Luzerne, the total cost of which building was to be in excess of $40,000. The contract provides for the duties of the Central Realty Company, among them, the following:

"looking after the purchase of all material; the auditing of all accounts; the payment of all labor; preparing vouchers for both material and labor bills; and for procuring all funds to erect the building, etc."

Provision is made in the contract for the employment by the owners of their own "clerk of works" at their own expense. The owner, Mr. Carstens, employed Earl Baumgartner as clerk of works, informing the Central Realty Company that he "wanted him to check up everything that went into the building and take care of his interests." Baumgartner performed such services for Mr. Carstens, and thereafter for the executors. W. J. Bruggeman was president of the Central Realty Company, and through associations with Carstens as directors of the same bank, and otherwise, they were well acquainted, and Carstens knew that the Central Realty Company was engaged in constructing two buildings for other persons at the same time the Luzerne was being built. Baumgartner also knew of the construction of the other two houses.

The Central Realty Company purchased lumber and building material for the Luzerne, and some for other buildings, from appellant, who was engaged in the

lumber business in Seattle. With each load delivered at the several jobs, the driver took delivery slips in duplicate, each numbered separately and consecutively, which showed the character of lumber in the load and where and to whom delivery was made. The originals of the slips were marked "Customer's Invoice," and were kept by the customer, while the duplicates were marked "Duplicate Must Be Returned to Office, Signed by Customer or His Representative. Received O. K. ————.'' The lumber furnished for the Luzerne building was all checked up by Baumgartner, and the duplicate delivery slips "O. K'd" and signed by him, and also by Charles Drake, secretary of the Central Realty Company, and returned by the driver to appellant's office. The original slips were kept by Baumgartner, who would first make entries of them in a tally journal belonging to the Carstens, and then file them in the records of their office at the building.

Appellant kept but one account with the Central Realty Company, in which was entered charges for all lumber delivered at all three buildings. The account, on a loose-leaf ledger, was kept so that one could easily segregate and determine the amount charged for material delivered to each of the buildings by reason of the entry thereon of the date and number of the delivery slips. That this is so is shown by the testimony of the bookkeeper of the Carstens estate, who, upon being called as a witness by the executors, said:

"I had no difficulty in obtaining a segregation between the Luzerne Apartments and the 79th street job. Q. They were on the same account, but they were separated as far as entries were concerned? A. Yes, sir. Q. How did they distinguish for you between the 79th street job and any other job that the

Central Realty Company was doing, and the Luzerne Apartments? A. If I remember rightly, by the numbers."

On cross-examination he testified:

"Q. Calling your attention to Defendants' Exhibit No. 1, being the loose-leaf ledger, take any one of the items and find here the date,—take the item right there, January 26th. Then you see a number out here, 5568, then you see the amount. Did you ask them what those numbers meant? A. Why, I found out. Q. And you found out that they were delivery slips? A. Yes, sir. Q. And so far as the Carstens job was concerned, you could tell by looking at those numbers where the lumber went, because the numbers gave you the exact knowledge? A. Correct. Q. So, when you told Mr. Flick the books did not show, the books did show, didn't they? If the books show 6551 and if 6551 was the Luzerne Apartments, then it did show it? A. I didn't state anything else. Q. Well, the books did show, didn't they? A. Why, certainly. Q. And you examined not only the loose-leaf ledger, but you examined all the delivery slips? A. Yes."

On the first of each month, appellant mailed to the Central Realty Company a statement showing the date and amount of each delivery, separately stated, giving date and amount for all the jobs during the previous month. In due course, and about the 10th of the month, the bill would be returned, accompanied by a personal check signed by Ernest Carstens, or, later, by the executors of his estate, for the exact amount due, each check having the words "building account" written after the signature. The amount of the check was credited by appellant on its books to the Central Realty Company, thus balancing the account, whereupon appellant stamped the bill "Paid," and returned it to the Central Realty Company. One of the monthly accounts was paid to a bank to which it

had been assigned for collection, but this transaction was in all other respects similar to the others.

The last check, dated June 10, 1916, and the only one issued by the executors, paid the account in full up to June 1, 1916. The amount for which the notice of lien was filed and that is involved in the action, viz., $961.44, is for lumber delivered for and used in the Luzerne Apartment building subsequent to June 1, 1916, as to which there is no dispute either as to the amount or its value. However, the sum total of all the checks of Carstens or his executors, received by appellant from the Central Realty Company in the manner above explained, exceeds the value of all material furnished by appellant that was used in the Luzerne building by the sum of $160.40. Judgment was awarded by the trial court against appellant and in favor of the executors in this sum of $160.40, on the theory that appellant should account to the executors, and not to the Central Realty Company, for all the Carstens checks.

The answer and cross-complaint of the executors stated a defense to appellant's cause of action, and sufficient to entitle the executors to the judgment appealed from, because therein, among other things, they alleged:

"That, during the course of said deliveries, said plaintiff and the said contractor, Central Realty Company, through its officers, entered into a secret and unlawful agreement, whereby said Schwager-Nettleton Mills, through its officers, agreed to rebate to said Central Realty Company one dollar a thousand for all number two common lumber that it might be possible to work into the job, in lieu of the number one lumber first agreed upon. That, as a consideration for said acts and in furtherance of the unlawful scheme entered into between these parties, said plaintiff and said Central Realty Company, through their

respective officers, agreed that the checks issued by Ernest Carstens should be used and deflected in part to the payment of the personal bills of the Central Realty Company, which course of procedure was adopted with checks numbered 146, 306, 496, 77 and 274, issued respectively February 9, 1916; March 10, 1916, April 10, 1916, May 10, 1916 and June 16, 1916, in form as detailed in schedule 'B' hereto attached and made part thereof.''

If the proof showed that appellant by its officers entered into and carried out any such unlawful scheme with the Central Realty Company through its officers, by which there was procured the issuance and delivery to the Central Realty Company, and thence to the appellant, of the checks in question, that conduct would in the law place appellant in direct relations with the makers of the checks and impose upon it the responsibility to account therefor. But an examination of the evidence fails to show any occasion for such charges. On the contrary, it is clear to us from the record that appellant furnished for the Luzerne building only the material ordered by the Central Realty Company, sold it at the usual prices, allowed the usual discount for cash, which was stated in the bills furnished to the Central Realty Company ten days before payments by it, all within the knowledge of Mr. Baumgartner, the private, confidential employee of the Carstens. The proof in the case is silent as to any conversation or communication, direct or indirect, between the appellant's officers or employees and Mr. Carstens or his executors concerning the material furnished or the payments received. Appellant sold and charged the material for this and the two other jobs to the Central Realty Company from whom it received its pay, and while that pay was by means of the Carstens checks, they were delivered to

appellant or its assignee by the Central Realty Company. Appellant never received notice from any one to apply the checks otherwise than as they were applied, and as they had the right to apply them. Concerning the transaction, Alvin Schwager, secretary-treasurer of appellant, testified:

"We did not know but what Ernest Carstens was advancing some money to the Central Realty Company over and above the amount of the lumber that went to that job. We could have ascertained whether the check was overpaying what had gone to the Luzerne Apartments, but we did not. We never notified him he was overpaying. There wasn't any occasion for it as far as we could see in the ordinary course of business. There was never a question raised in our mind. We never received any letter from Ernest Carstens authorizing us to so apply these amounts, nor did we receive any from Mrs. Carstens, nor Julius Carstens, nor from Mr. Bruggeman or Mr. Riley."

It is important here to determine, as we do, only if the Carstens estate, by someone's carelessness or misunderstanding, has suffered a loss, whether appellant is in any way responsible for it. We are of the opinion it is not. In opening, appellant proved its case.

The judgment is reversed and the cause remanded with directions to the lower court to enter judgment foreclosing the lien.

CHADWICK, C. J., MACKINTOSH, MAIN, and TOLMAN, JJ., concur.