[No. 24116.   *En Banc.*   July 13, 1933.]

NORMAN B. ABRAMS, *Appellant,* v. THE CITY OF SEATTLE *et al., Respondents.*[1]

[1]Reported in 23 P. (2d) 869.

496

*Stephen V. Carey,* for appellant.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondents.

*Harold Preston* and *O. B. Thorgrimson, amici curiae.*

BLAKE, J.—This action was brought to enjoin the defendants from issuing warrants on the light department construction fund, in the amount of $189,000, in favor of certain persons who advanced money, performed labor and furnished material in connection with the construction of a substation on property owned by the city, and located on Third avenue, between Madison and Spring streets. After issue joined, and trial had, the court entered judgment dismissing the action. From this judgment, plaintiff appeals.

On and prior to January 21, 1930, the city was the owner of the entire half block fronting on Third av-

enue between Madison and Spring streets. It had begun the acquisition of this tract in 1925, with the purpose of erecting a substation thereon in connection with the extension and improvement of its light and power system. The original plan contemplated the erection by the city of a building of two or three stories and basement, in which could be housed machinery and equipment of a substation, and in which could be consolidated the various offices of the light and power department—the latter being scattered among three different buildings. For reasons which seemed expedient to the city council, this plan was not carried out. A plan was evolved to erect upon the property a twenty-four story building. It is the attempt to carry this plan into effect that gives rise to this litigation.

The method used to carry out the plan was quite complicated. We do not think, however, it is necessary to pursue it step by step. For the purpose of disposing of the questions here raised, it will suffice to give a general outline of the plan.

On January 21, 1930, the city council, by ordinance, authorized a lease of the property, under terms therein specifically set out, to be entered into with one L. A. DeCou for a term of fifty years. There was no rent reserved in the lease. The consideration to the city was the erection by DeCou of a twenty-four story building on the property, the basement and subbasement of which was to belong to the city. From the Third avenue level up, the building was to belong to DeCou for the term of his lease, at the expiration of which that portion of the building would also become the property of the city. Under the terms of the lease, DeCou acquired no rights in the ground. It was provided that no liens should attach to the ground or to the basement or subbasement.

In other words, the city was to get its substation erected without cost to it, in consideration to DeCou of the right to erect over it a superstructure twenty-four stories in height. In addition, the city reserved the right to occupy certain portions of the super-structure at specified rentals. The lease fixed the time limit for the erection of the entire building at eighteen months from the date of execution of the lease, and provided for forfeiture in case it was not so completed. The expiration of the time for the completion of the building would have occurred October 28, 1931.

DeCou was without sufficient means to carry out the enterprise, so a group of persons who were interested in seeing it consummated, organized a corporation known as the City Light Building Company. This corporation was also without means, but it took an assignment of the lease, having in mind the construction of the building by financing arrangements much in vogue at, and prior to, that time.

Arrangements were made with a St. Louis house to loan $1,250,000 on a structure to cost approximately $1,750,000. This arrangement was conditioned, however, upon the building company first arranging for the balance of the financing. In other words, before the St. Louis people would be obligated to advance any money, the building company must have an investment of $500,000 to $600,000 in the building. This secondary financing was arranged for with a savings and loan association of Portland. This contemplated the issuance of preferred stock by the building company, of the par value of one hundred dollars, which would be sold at eighty dollars per share to the savings and loan association, and passed on by it to Seattle investors at one hundred dollars per share.

These arrangements made, contracts were let for the construction of the building, and work was com-

menced on October 24, 1930. All went well until the spring of 1931, when the savings and loan association failed to advance money on the preferred stock. In the meantime, however, preferred stock had been sold by it to investors in the amount of $105,000. The building company had received from the savings and loan association an amount in excess of that, all of which went into the structure which now stands on the property.

Construction work ceased on or about April 26, 1931. At that time, the basement and subbasement were practically completed. According to the testimony, it would require an expenditure of less than $8,000 to make it ready for occupancy as a substation—the purpose, it is to be remembered, for which the property was originally acquired.

Subsequent to April 24, the building company endeavored to make other arrangements for financing, but was unable to do so in time to complete the building by October 28, 1931, the time limited by the lease. The building company wanted an extension of time for the completion of the building; and its officers assert, with some show of probability, that new arrangements for financing could have been made, had such extension been given by the city and approved by the court. The city, however, preferred to abandon the entire enterprise, but it was willing to pay the building company the reasonable value of the structure the latter had placed upon the property. The building company claimed the improvement was worth $235,000. The city appraised it at $189,000, and there is no evidence that it is not worth at least that much.

So we have this situation: The building company has erected on the city's property a building worth $189,000, which has cost the city not a cent, but for which it is willing to pay, and for which it, in good

conscience, ought to pay. To that end, the building company made a written proposal to the city to assign to the latter its lease for $189,000, and furnish certificate showing good title in the city, free of all liens and encumbrances whatsoever. (In passing, it should be noted that liens in excess of $130,000 had been filed against the property.) The city accepted the proposal, and undertook to carry it out by the passage of ordinance No. 61,679. By this ordinance, it appropriated from the city light construction fund $189,000 for that purpose; and authorized the issuance of warrants aggregating that amount to various lien claimants and bona fide purchasers of the preferred stock of the City Light Building Company.

The appellant contends that the city has no power to issue warrants for such purpose or to such persons. Counsel's argument in support of the contention may be divided under two heads: (1) That the lease to DeCou was *ultra vires*—that the city had no power to erect an office building; and (2) that, conceding, for argument's sake, the lease was valid, it had been abandoned by the lessee and was subject to forfeiture at the time the attempted settlement was made, and consequently there were no legal claims which could be the basis of a compromise.

Conceding that the lease was void, still the municipality may not escape payment of the reasonable value of what it actually received as a result of the enterprise of the lessee. It did have the power to erect a substation on the property. It could have let a contract for that purpose which would have been valid and binding. Had it done so, even though such contract had been void for want of regularity in any particular (such as failing to advertise for bids), still the city would have been required to pay the reasonable value of the building, although no recovery could

have been had on the contract. *Green v. Okanogan County*, 60 Wash. 309, 111 Pac. 226, 114 Pac. 457; *Mallory v. Olympia*, 83 Wash. 499, 145 Pac. 627. In the latter case, the court says:

"In this case, applying the same test, the terms and conditions, the time and manner of payment, and all details of the contract are immaterial. When plaintiffs show that they have furnished materials and labor which the city has put to its uses and has not paid its reasonable value, they have made out a *prima facie* case. Neither does the defense rest in contract, but would go only to the value of the labor and material less the damages and expenditures the city had been put to in adapting that labor and material to its final use.

"This court has endeavored to hold municipalities to the same standard of right and wrong that the law imposes upon individuals. *Franklin County v. Carstens*, 68 Wash. 176, 122 Pac. 999; *Coliseum Inv. Co. v. King County*, 72 Wash. 687, 131 Pac. 245; *State ex rel. Maddaugh v. Ritter*, 74 Wash. 649, 134 Pac. 492; *Ettor v. Tacoma*, 77 Wash. 267, 137 Pac. 820. In *Green v. Okanogan County*, 60 Wash. 309, 111 Pac. 226, it was sought to enjoin the execution of a contract on the ground that it had not been let in accordance with the requirements of the statute. The court found that the controlling statutes were in fact violated and that the contract was void. Certainly a contract substantially performed, although held to be abandoned, stands upon no lower plane than a void contract. Yet, notwithstanding, we said:

" 'This court has adopted the more equitable doctrine of allowing the parties, where the contract if entered into in conformity with the statutes would not have been unlawful, to retain from the moneys received by them a sum equivalent to the reasonable value of the property the county acquires and retains in virtue of the execution of the void contract. . . . So in this case, since the county has accepted and made use of the bridge, it is liable to the builders for its reasonable value.' "

Since the city is attempting to pay only for what it had the power to obligate itself to pay, we think the rule of the above cases applicable here. Other cases applying the rule are: *Besoloff v. Whatcom County,* 133 Wash. 109, 233 Pac. 284; *Strong & MacDonald v. King County,* 147 Wash. 678, 267 Pac. 436; *O'Connor v. Murray,* 152 Wash. 519, 278 Pac. 176.

■ What has been said applies with equal force to the second ground of appellant's attack on the ordinance. It is conceded, however, that a municipality has the power to compromise claims. *Franklin County v. Carstens,* 68 Wash. 176, 122 Pac. 999. The power to settle does not depend on the possible ultimate decision for or against the validity of the asserted claim. 44 C. J. 1449. We do not share appellant's view that the lessee was practically in default at the time the settlement was made. It is true the building could not have been completed within the original time limit, but we think a court of equity would have lent a willing ear to the lessee, under the particular facts of this case, had it resisted a forfeiture, in view of the showing here made: (a) that the lessee had expended in excess of $200,000 on the lessor's property, and (b) that it had reasonable ground to believe that new arrangements could be made for financing if an extension were granted.

■ Nor do we share appellant's optimism with respect to the invalidity of the lien claims. The fact that the city, under the lease, *required* the erection of a building on the property, and the further fact that it failed to take a bond, as required by Rem. Rev. Stat., § 1159, give rise to some interesting speculation, to say the least.

There was another element which may have influenced the city officials in making the settlement, and which may have prompted them in their refusal to

consider an extension of time for the construction of the building. The city had obligated itself to pay in excess of $90,000 a year rental for a term of twenty years for space in the upper floors of the building. Taking all of these facts into consideration, the situation was such as to reasonably induce the city officials to believe that long, arduous and expensive litigation was ahead. That such litigation might have been successfully defended, is beside the question. We are convinced that the building company had such a claim as was the subject of compromise and settlement by the city.

It is finally objected that, since the ordinance directs that a certain amount of the warrants be issued to purchasers of the building company preferred stock, the transaction is, in that respect, a purchase of the stock. We think this is an objection to form, not substance. *Franklin County v. Carstens*, 68 Wash. 176, 122 Pac. 999. The claim was made by the building company on the basis of the value of the improvements it had placed on the city's property. The city might have paid the whole amount to the building company and this objection could not have been made. It was perfectly proper, however, for the city, in accepting the settlement offered, to stipulate the warrants should be issued directly to those who were entitled to be recompensed under the terms of the settlement.

The judgment is affirmed.

MAIN, MILLARD, MITCHELL, TOLMAN, and HOLCOMB, JJ., concur.

STEINERT, J. (dissenting)—I dissent. It seems to me that the result of the majority holding simply permits the city council to give away $189,000 of public funds.

The facts of the case, as I read them, are these:

At various times prior to January 21, 1930, the city of Seattle had acquired by purchase, at a total cost of $407,280, several lots making up the entire half block fronting on Third avenue between Madison and Spring streets, in that city. The object in acquiring the site was to erect a substation for the lighting department of the city.

In 1929, pursuant to council resolution, the city had advertised the real estate for lease, and in response thereto one L. A. DeCou submitted his bid for the concession. On January 21, 1930, the city council passed ordinance No. 58836, relating to the acceptance of DeCou's bid and the authorization of a lease to be executed with respect thereto. Section 3 of the ordinance provided that it should not take effect until it had been submitted to the people at a general municipal election and by them approved. The bid and proposed lease were approved at such general election held March 11, 1930, and on April 29, 1930, the lease was formally executed. Thereafter, the lease was assigned by DeCou to a corporation organized for that purpose by him and his associates on May 17, 1930, and known as City Light Building Company. That corporation was purely a private concern, and, despite its name, had no legal connection with the city itself.

The lease, which was for a term of fifty years, provided that the lessee should construct on the premises, at his sole cost and expense, a building suitable for use as a substation of the municipal light and power plant and to be completed within one year from date of the execution of the lease; it also provided that the lessee should, at his sole cost and expense, construct above the substation, within eighteen months, a twenty-four-story office building to cost not less than $1,750,000. The title to the land and substation was to remain vested in the city, while the title to the por-

tion of the building above the substation was to be in the lessee during the term of the lease.

There was a further provision in the lease that the lessee should keep the premises free and clear of liens, and in no event was the real estate to be liable for any expense connected with the cost of construction. Upon default for a period of sixty days of any covenant or agreement to be performed by lessee, the city was to have the right, upon thirty days' notice in writing, to enter upon the premises and take possession thereof, and thereafter all improvements were to become forfeited to the city. According to the lease the lessee was not to pay any rent, the consideration to the city being the erection of the building under the conditions above set forth.

Following the execution of the lease, ordinance No. 59789, passed July 28, 1930, authorized the city to enter into a lease with the City Light Building Company for the occupancy by the city of certain space in the proposed building for a term of twenty years, the total rent to be paid therefor amounting to $92,395 per annum.

The City Light Building Company, which will hereafter be referred to as the "lessee" or else as "the building company," having no funds of its own with which to construct the building, sought to raise the money by securing an agreement or commitment from Mercantile Commerce Company of St. Louis to loan approximately $1,250,000 upon the security of the leasehold interest, dependent upon the lessee first raising approximately $500,000 from the sale of its preferred stock, or otherwise. The major sum is designated as the "primary financing," and the minor sum as the "junior financing." The building company engaged one Earl W. Morrison as architect and the Sound

Construction Company as the contractor, in the construction of the building.

The work of construction actually began about October 24, 1930. The construction work was carried on by means of funds realized from the "junior financing," that is, the sale of the building company's preferred stock. This financing was done through the Mortgage Investment Company of Portland under a plan whereby that company was to take the preferred stock on the basis of eighty dollars per share and sell it on the basis of one hundred dollars per share. About $105,000 worth of preferred stock was sold by the Mortgage Investment Company to small investors, many of whom were employees of the city light department, and the total amount realized by that company from such sales, so far as they went, was actually paid over to the contractor.

On April 26, 1931, the work of construction ceased because, as found by the trial court,

" . . . the City Light Building Company was financially unable to continue the same because of inability to make further sale of its stock; that it was insolvent at the time and ever since has been and now is insolvent and unable to pay its obligations in the ordinary course of business."

However, it still remained in possession of the property and kept watchmen thereon.

At the time of cessation of the work, the substation was not completed, and, of course, nothing had been done toward erecting the twenty-four-story office building. Financial assistance from the St. Louis and Portland institutions could no longer be realized upon, the latter being unable to respond and the former flatly refusing to do so because the conditions precedent had not been performed. The building company sought an extension of time within which to refinance the propo-

sition and to complete the work, but the city council emphatically declined to grant the request.

On April 22, 1931, just four days before the work of construction entirely ceased, the building company entered into a contract with one George Nelson to take over the construction work. Nelson's contract was to complete the building on the basis of a construction cost of $1,624,876.05, but was conditioned upon the advancement by the St. Louis concern of the $1,250,000 originally agreed to be advanced by it. Inasmuch as that company never advanced the money, Nelson's contract never became of any binding force or effect, nor was anything ever done thereunder.

After the work had ceased, liens, including those of the architect and of the contractor, aggregating in all $137,000, were filed. With the full situation well known to all parties concerned, the city council concluded to terminate the contract, and the building company was advised of that conclusion, although it must be admitted that the formal notice in writing was not given by the city. The city's method in terminating the contract and its action upon such termination form the basis of this suit. On October 25, 1931, which was just three days before the expiration of the time allowed for the completion of the building, the city council passed ordinance No. 61679, which contained a recital to the effect that the fair value of the structure, so far as it had been completed (consisting only of the substation), was $189,000, and appropriated that amount from the light department construction fund to be paid as follows: $84,000 to the architect and the contractor, and $105,000 to the holders of the preferred stock. This action seeks to enjoin the payment of those funds.

As stated in the majority opinion, the appellant makes two contentions: (1) that the lease to DeCou

was *ultra vires*—that the city had no power to erect an office building; and (2) that, conceding, for argument's sake, that the lease was valid, it had been abandoned by the lessee and was subject to forfeiture at the time that the attempted settlement was made, and consequently there were no legal claims which could be the basis of a compromise.

That the first contention of appellant must be upheld, it seems to me is without question. The whole venture was one where the city was virtually trading in property acquired for the use of a municipally owned system for an interest in a wholly private enterprise which, to say the least, was speculative in its nature. There is no statutory warrant for such venture by the city, and in the absence of statutory warrant, no obligation could arise against the city thereon, and any attempt to so obligate it would be wholly invalid and illegal. *State ex rel. Hill v. Port of Seattle,* 104 Wash. 634, 177 Pac. 671, 180 Pac. 137.

The majority opinion is based upon two theories. The first is that, conceding that the original lease was void, the city may not escape payment of the reasonable value of what it actually received. Reliance is placed upon the following cases: *Green v. Okanogan County,* 60 Wash. 309, 111 Pac. 226, 114 Pac. 457; *Mallory v. Olympia,* 83 Wash. 499, 145 Pac. 627; *Besoloff v. Whatcom County,* 133 Wash. 109, 233 Pac. 284; *Strong & McDonald v. King County,* 147 Wash. 678, 267 Pac. 436; *O'Connor v. Murray,* 152 Wash. 519, 278 Pac. 176.

The cases relied on by the majority, however, are inapplicable here, for the reason that, in those cases, the municipality had the statutory power to make the particular contract. Here, under the law, and by the concession of the majority opinion, the city had not. A legal liability against the city can not arise upon a con-

tract which itself is illegal and which the city had no right to make. The majority opinion justifies itself by the statement that the city had the power to erect a substation. That would be true if the city had proceeded with a purely municipal venture, but here it became virtually a partner in what was a private enterprise. This can not be done, nor can legal liability be predicated upon its abortive attempt.

But a stronger answer to the reasoning of the majority is that, even if the contract were legal, the city never contracted to pay for the substation, and that is all that it got. What the building company was to receive from the city was the right to erect and use the twenty-four-story office building. That has never been built. The city is therefore paying for something that it was never intended that it should pay for in money, but only by granting a license to build a superstructure above its substation.

So far as the claims of the architect and contractor are concerned, the evidence shows completely that they knew of the conditions of the lease and were entirely familiar with the plan under which the building company was promoting the enterprise. They knew that no lien in their favor could attach to the land or to the substation (1) because the contract so provided, and (2) because such is the law anyway. They knew also that no bond was being exacted, nor intended to be exacted of the building company by the city, yet, with this knowledge, they extended credit to the building company alone, relying upon their having a lien upon the superstructure when built.

The object of the statute requiring the city to exact a bond in public construction work is to protect persons who, in good faith, furnish labor and material in the construction of a public building, upon the supposition that the principal contractor and the municipality

have complied with the law relative to the giving of a bond. That is not the situation here at all. Neither the architect nor the contractor performed any labor or furnished any material upon the faith or credit of any bond to be exacted by the city, for they both knew that none was to be furnished; they relied wholly upon the credit of the building company and the liens which they might have upon the office building when completed.

With reference to the preferred stockholders, there is even less reason, in law, for recognizing any claims on their part. In fact, I think that there is no reason at all. Undoubtedly, they were innocent investors who were about to lose their entire investment, not through the fault of the city, for it had done all that it agreed to do, but through the fault of the building company. While it may exhibit a charitable disposition on the part of the council to guard the public against loss resulting through the purchase of stock, I can see no reason for passing that loss on to the city, unless we accept it as a principle of law that the city ought to pay because it is better able to pay, and that the taxpayer will never feel it, or perhaps will never know it. How the preferred stockholders could ever compel payment by the city, I am at a loss to understand.

The second theory of the majority opinion, meeting the appellant's second contention, is that a municipality has the power to compromise claims. That theory, I think, is also untenable. Here the claims were wholly illegal, and the council could not by resolution or ordinance resolve them either into valid claims or into doubtful claims, thereby giving support to a compromise. The council is, or at least is supposed to be, the conservator of the public's money, and it is not for it either to give it away or to compromise it away. In either event, it is gone.

Again, the majority opinion attempts to justify itself by a statement to the effect that, even though the time for completing the building had expired, a court of equity would have lent a willing ear to the lessee, had it resisted a forfeiture. As the trial court found, the building company was wholly insolvent. It had reached the end of its rope, so far as financial aid was concerned. Its only hope was in the contract that it subsequently made with Nelson, and that hope failed of its expectancy in its very inception. However willing an ear a court of equity might have lent, what relief could the court have extended with the facts of the case before it? And how could the council base a compromise upon a speculative prejudgment of what the court might do?

The sum and substance of the whole matter, as I see it, is that the building company agreed to do a specific thing, and failed. At the time of its failure, it was wholly insolvent, and without possible ability to proceed. What the city received it was entitled to. Having complied with its part of the contract, it was in no sense obligated to pay $189,000 for what it had not agreed to pay a cent.

I therefore dissent.

BEALS, C. J. (dissenting)—I also dissent, and in the main, I concur in what Judge Steinert has said.