[No. 39276. Department Two. July 18, 1968.]

DAVID R. FINCH et al., Respondents, v. JOHN G. MATTHEWS, JR., et al., Defendants, THE CITY OF SEATTLE, Appellant.*

*Reported in 443 P.2d 833.

*A. L. Newbould* and *E. Neal King,* for appellant.

*Malcolm S. McLeod,* for respondent.

WARD, J.†—This is an appeal by the defendant, city of Seattle, from a decree quieting the plaintiffs' (respondents') title to a tract of real estate presently lying within the boundaries of the city. This tract of land was placed on the tax rolls by King County in 1935. The taxes were not paid and the county foreclosed its tax lien, purchased the property at the foreclosure sale in satisfaction of its lien and received a deed from the county treasurer, conveying the property to it in October 1951. On November 6, 1952, the county entered into a real-estate contract, pursuant to RCW 84.64.270, by which it agreed to sell the property to the plaintiffs for a purchase price of $1,005. The purchase price was paid by the plaintiffs, and on November 1, 1962, they received the county treasurer's deed conveying the property to them.

The area where this land lies was annexed by the city of Seattle on March 1, 1953. It is the contention of the city that all of the above-recited acts, done by King County, were ultra vires and void, and hence, the plaintiffs are without title to the land purchased from the county. The city bases its claim to the property upon the contention

---

†Judge Ward is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

that the plaintiffs' property was dedicated "to the use of the public forever," as a part of a street on May 6, 1906, when the plat of Lake Shore View Addition to the city of Seattle was recorded in vol. 13 of plats, p. 15, records of King County, by Seaboard Security Company, and that it has at all times since remained, and is now, a street. The city of Seattle claims it acquired this street on extension of the corporate boundaries on March 1, 1953. The trial court held otherwise, and this appeal followed.

The evidence reveals an unusual factual pattern with respect to the title to this tract of land. At the time Seaboard Security Company recorded its plat, it owned Government Lot 2, lying north of the east and west center line of Section 34, Township 26 North, Range 4 East, W.M. in King County. John G. Matthews and wife owned Government Lot 3, adjoining, lying south of this east-west center line. Seaboard Security Company, in platting its property, intended to leave a highway or street (which appeared from the plat to be about 30 feet wide, although its width was not stated on the plat), running east and west between the southernmost platted lots and the center line of the section. This 30-foot strip of land is designated as Indianapolis Street on the recorded plat. A resurvey in 1914 disclosed that the east-west center line of section 34, was approximately 60 feet south of where Seaboard Security Company thought it was when it platted Lake Shore View Addition, making it 60 feet south of its location as shown on the recorded plat. As a result of this error, there was left a tract of land running east and west between the platted lots of the addition and the center line of the section, 90 feet in width, instead of 30 feet in width, as intended by the platters.

Subsequently, an action was brought by John G. Matthews, who sought removal of fences and obstructions from Indianapolis Street. I. Curtiss Parker intervened in the action and claimed title to the 60-foot strip of land lying between Indianapolis Street, as platted, and the east-west center line of section 34. On appeal to this court, in *Matthews*

*v. Parker,* 163 Wash. 10, 16, 299 Pac. 354 (1931), we held "that Indianapolis street necessarily occupies the full width of the land between the south line of the south row of lots and blocks and the east and west center line of the section which is established by the center of the section as a monument." The effect of this decision was to make Indianapolis Street, 90 feet wide, instead of 30 feet wide as it appeared on the plat.

In 1928 King County made plans to open a street or highway between the property owned by Mr. Matthews and the platted area, but the county engineer, in preparing his plans for the highway, which is now designated as N.E. 95th Street, found that a deep ravine and creek traversed the northerly part of the 90-foot strip of land lying north of the relocated center line of section 34, and that it was not feasible to construct the highway on this property. The county, therefore, sought to acquire a road right-of-way, which would be 60 feet in width, with the east-west center line of section 34, as the center line of the relocated highway. At that time, Mr. Matthews owned the south 30 feet of the proposed right-of-way as a part of Government Lot 3 and claimed to own the 60-foot strip of land north of the center line of the proposed highway. The county was able to acquire the desired road right-of-way from Mr. Matthews by means of an exchange agreement, which is set out in resolution No. 2791, adopted by the King County commissioners on March 12, 1928.[1]

---

[1]Resolution No. 2791: "THAT WHEREAS Lot 2, Section 34, Township 26 North, Range 4 East, W.M., was subdivided and plat filed and approved as the Lakeshore View Addition, which plat is on file in the office of the County Auditor of King County, and

"WHEREAS in the laying out and platting of said Lakeshore View Addition 30 feet was left on the south side of said tract and dedicated for highway purposes, and

"WHEREAS John G. Matthews is the owner of Lot 3, immediately south of Lot 2, and whereas the county engineers do not deem the line dividing said Lots 2 and 3 as feasible for highway purposes, and whereas John G. Matthews, the owner of Lot 3, has offered to convey to the County of King for highway purposes 60 feet of ground, a distance of 520.28 feet and thence on a curve to the right for a radius of 116.93 feet, a distance of 125.75 feet to a junction with the James Kiefer Road in

The deed from Matthews to King County was not introduced in evidence, but it may be assumed that such deed was delivered because King County constructed the highway now designated N.E. 95th Street, with the center line of the highway along the relocated east-west center line of section 34. The present street is 60 feet wide with 30 feet on each side of the center line of the section.

Resolution 2791 must be construed in accordance with Mr. Matthews' claim of ownership at the time the exchange agreement was consummated. It was the intention of King County by the terms of resolution No. 2791 to grant the original 30-foot strip of land, platted as Indianapolis Street, to Mr. Matthews, and it was Mr. Matthews' intention to convey to the county a 60-foot strip of land for road purposes being 30 feet on either side of the relocated center line of section 34.

This intention of the parties is evidenced by the construction of the highway at the present location of N.E. 95th Street, and by the fact that the county placed on its tax rolls and later foreclosed its tax lien against the property now claimed by the plaintiffs. The tract was described in the foreclosure proceedings and on the resale to plaintiffs as: "Indianapolis St. and unplatted Strip adjoining running to center 46th Avenue N.E., less County Road, Block 5, Lake Shore View Addition to city of Seattle." This

---

exchange for said 30 feet conveyed to King County from Lot 2, now known as Lakeshore View Addition,

"Now, THEREFORE, on recommendation of the engineers of King County, Washington, it is ordered that said proposition of said John G. Matthews be and the same is hereby accepted and the said John G. Matthews has delivered a deed for said tract first above described for highway purposes and the county of King hereby releases and conveys to John G. Matthews in consideration of said deed from said John G. Matthews to said King County for said first described tract that certain strip or tract of ground 30 feet in width commencing at the southwest corner of the southwest block, lot or tract of the Lakeshore View Addition as platted to where said line connects with the James Kiefer Road, being a tract of land 30 feet wide and about 540 feet more or less long.

"PASSED this 12th day of March, 1928.

[Signatures]"

property is more particularly described in the trial court's decree quieting title.[2] This describes a strip of land, approximately 60 feet wide, lying between the north marginal line of present N.E. 95th Street, and the southernmost lots of a part of Lake Shore View Addition.

 Jurisdiction to grant relief by a decree quieting a claimant's title to land is inherent in a court which exercises equity powers. 44 Am. Jur. *Quieting Title* § 3 (1942). This state is aligned with those jurisdictions which permit one who has only an equitable title to land to maintain an action to quiet title, even though out of possession. *Brodsky v. Nelson*, 57 Wash. 671, 107 Pac. 840 (1910); *Carlson v. Curren*, 48 Wash. 249, 93 Pac. 315 (1908); *Brown v. Baldwin*, 46 Wash. 106, 89 Pac. 483 (1907); RCW 7.28.010. The superior title whether legal or equitable must prevail. *Rue v. Oregon & Washington R.R.*, 109 Wash. 436, 186 Pac. 1074 (1920); RCW 7.28.120. The plaintiffs' claim, therefore, should not be dismissed as the city claims because King County purported to convey the property to Matthews by means of a resolution rather than a deed, nor should it be dismissed because of any indefiniteness in the description of the land in the tax foreclosure proceedings or in the conveyance by King County to the plaintiffs.

 If the plaintiffs had title prior to the decree entered by the trial court, their title was equitable not legal. We

---

[2]"That portion of the northeast one quarter of section 34, Township 26 North, Range 4 East, W.M., in King County, Washington, described as follows:

"Beginning at the southwest corner of Lot 10, Block 5, Lake Shore View Addition to the City of Seattle as recorded in Vol. 13 of Plats, page 15, records of said King County, Washington, thence N 88°26'01" W 30.0 feet, more or less, to a point in the center line of 46th Avenue N.E.; thence south 1°43'58" west along the center line of 46th Ave. N.E., extended a distance of 59.64 feet, more or less, to a point on a line which lies 30.00 feet north of the east-west centerline of said Section 34; thence south 88°15'49" east 191.892 feet to a point of curvature; thence along the arc of a 78.103 foot radius curve to the left a distance of 104.862 feet to a point on the south line of said Lot 10, Block 5; thence N 88°26'01" W along the south line of said Lot 10, Block 5 a distance of 237.975 feet, more or less, to the point of beginning of this description; . . . . All bearings based on Washington Coordinate System, North Zone."

examine therefore the equities upon which the plaintiffs rely, and we find that the record discloses the following matters which appeal to the conscience of the court.

The plaintiffs purchased subject to a local improvement assessment in the sum of $102.02, which they have paid. They have paid real-estate taxes on the property since they purchased it in 1952, including that portion of the taxes assessed by the city of Seattle. Plaintiffs were engaged in filling the ravine on the property when stopped by the city of Seattle and claim to have expended approximately $6,800 in the project. This claim was not controverted nor questioned by the city. They paid to King County the purchase price of $1,005 and the accruing interest over a period of 10 years. The city has never tendered to the plaintiffs any sum whatsoever as reimbursement for any of the sums so expended by them.

Neither can we ignore the further equitable considerations. The platters of Lake Shore View Addition dedicated to the public for a street, a tract of land which was traversed by a ravine, and was therefore, as the county commissioners declared, not "feasible for highway purposes." The county wisely decided to forever abandon the land for street purposes, and was able to exchange such property under its agreement with Mr. Matthews, for a tract of land which served the public purposes. Now, after the successors in title to Mr. Matthews have expended several thousand dollars converting this tract into a valuable piece of property, the city of Seattle, as successor to King County's rights by reason of the extension of the boundaries of the city, seeks to take the property from the present owners. The city took no steps to assert its claimed interest until the filling operations were substantially completed, and the plaintiffs had expended several thousand dollars in the improvement. On oral argument, the city was unable to state that it had any present use for the property.

Since *Burmeister v. Howard,* 1 Wash. Terr. 207 (1867), this court has not departed from the rule established in that case, that the fee in a public street or highway re-

mains in the owner of the abutting land, and the public acquires only the right of passage, with powers and privileges necessarily implied in the grant of the easement. *Puget Sound Alumni of Kappa Sigma, Inc., v. Seattle,* 70 Wn.2d 222, 422 P.2d 799 (1967). This rule was applied specifically to a street dedicated to the public through the recording of a plat in *Schwede v. Hemrich Bros. Brewing Co.,* 29 Wash. 21, 69 Pac. 362 (1902). Therefore, the only property right which either the city of Seattle, or King County ever acquired in the tract of land in controversy, was an easement for passage and use for street purposes.

In the instant case, the plaintiffs joined as defendants certain heirs of John G. Matthews "and also all other persons and parties unknown claiming any right, title, estate, lien, or interest in the real estate described in the complaint herein, and against the whole world." In a quiet title action, specific statutory authority is granted to obtain jurisdiction over such unknown owners or claimants and to adjudicate their property rights by in rem proceedings. RCW 4.28.150. Judgment was entered quieting plaintiffs' title against the claim of all such possible claimants to the fee in Indianapolis Street, and the plaintiffs' title to such fee cannot be questioned, and is not now, an issue in this case.

This leaves the city's posture in this case substantially as follows. The city's greatest claim to the strip of land, about 60 feet wide and about 200 feet long, which is the subject of this action, is limited to an easement for passage, over terrain, which on account of the ravine and creek traversing the property was found by the King County commissioners not feasible for street purposes and which was exchanged for adjoining property. This transaction resulted in a definite and substantial benefit to the county, and continues to be a benefit to the city. Therefore, the question before this court, is whether this factual situation lends itself to the application of equitable principles.

The city does not deny that its position is palpably inequitable, and does not claim that the annexation of this area to the city clothes it with any greater interest than

King County would have. It is the city's contention that equitable considerations must be ignored by this court, because of its claim that the acts of King County in disposing of the property were ultra vires. It is the city's position that equitable estoppel may be invoked against a governmental body or agency only when the governmental act is strictly within the recognized and established powers of government.

The city relies upon the rule stated by this court and applied in *State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 27, 182 P.2d 643 (1947):

> It follows from what we have said, that the promise or "agreement" of 1934 was not authorized by our statutes then in force, and was indeed contrary to the policy of those legislative enactments, and, hence, was illegal.
>
> The contract being illegal, the respondents may not invoke the doctrine of estoppel to enforce it. As this court said in *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L.R.A. 404:
>
> "The nonenforcement of illegal contracts is a matter of common public interest, and a party to such contract cannot waive his right to set up the defense of illegality in an action thereon by the other party. . . . it becomes the duty of the court to refuse to entertain the action. . . . The appellants are not estopped to raise the illegality of the contract because of their course of dealing with respondents under the contract. *Validity cannot be given to an illegal contract through any* principle of estoppel."

It will be noted, however, that in the case cited above the majority found also that equitable rights were not established.

■ It is the general rule that the courts will not apply principles of equitable estoppel against the government or government subdivisions under certain situations. These are well summarized in the text statement found in Annot. 1 A.L.R. 2d, 340-41 (1948).

> As a general rule the doctrine of estoppel will not be applied against the public, the United States government, or the state governments, where the application of that doctrine would encroach upon the sovereignty of the

government and interfere with the proper discharge of governmental duties, and with the functioning of the government, or curtail the exercise of its police power; or where the application of the doctrine would frustrate the purpose of the laws of the United States or thwart its public policy; or where the officials on whose conduct or acts estoppel is sought to be predicated, acted wholly beyond their power and authority, were guilty of illegal or fraudulent acts, or of unauthorized admissions, conduct or statements; or where the public revenues are involved. (Footnotes omitted.)

The many cases in which principles of equitable estoppel have been applied against all forms of government, from the United States government to those in the lowest echelons, establish that such immunity as exists is not an absolute, but only a qualified or limited immunity. The above-quoted text states at 340:

Yet there are many situations and instances in which the sovereign state, and particularly the subordinate governmental agencies, may be and have been held subject to the doctrine of estoppel as any other individual or corporate entity. These situations or instances are sometimes spoken of as exceptions to the rule against applicability of the doctrine of estoppel to government and its subordinate agencies. It is doubtful whether these are true exceptions to rather than integral parts of the rule itself. In many cases the rule of immunity of the state from the doctrine of estoppel is not stated as an absolute, but merely as a qualified, immunity. In other cases the rule is stated as if no immunity exists except in the narrow field where sovereignty would be impaired.

Measuring the factual situation in this case against those in which immunity must be applied, we find nothing in the instant case by which the application of the doctrine of equitable estoppel could be deemed an encroachment upon governmental sovereignty, an interference with the proper discharge of governmental duties, or a curtailment in the exercise of police powers. Neither can we say that the county commissioners, in obtaining a usable road right-of-way in exchange for one of little or no public value, were guilty of an illegal or fraudulent act, one in which the

public revenue was dissipated or one which violated public policy.

There remains for consideration, therefore, only the city's contention that equitable estoppel cannot be invoked here because of the claim that the acts of the county commissioners were ultra vires and therefore illegal, or, as the above-quoted text states, were "wholly beyond their power and authority."

■ Equitable estoppel may be applied against the claim of the municipality where the acts are within the general powers granted to the municipality even though such powers have been exercised in an irregular and unauthorized manner, assuming that all of the other elements of the doctrine are present, as they are in this case.[3] The rule is well stated in 31 C.J.S. *Estoppel* § 144 (1964):

> Although, as discussed supra § 143, a municipality or other governmental agency cannot be estopped by its ultra vires acts, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power and the total absence or want of power; and the rule is that a municipality or other governmental agency may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized. (Footnotes omitted.)

This rule has found application in *King Cy. v. Commercial Waterway Dist. No. 1*, 42 Wn.2d 391, 255 P.2d 539 (1953); *Strand v. State*, 16 Wn.2d 107, 132 P.2d 1011 (1943); *Jones v. Centralia*, 157 Wash. 194, 289 Pac. 3 (1930); *Seward v. Fisken*, 122 Wash. 225, 210 Pac. 378, 27 A.L.R. 1208 (1922); *Washington Water Power Co. v. Spokane*, 89 Wash. 149, 154 Pac. 329 (1916); *Franklin Cy. v.*

---

[3] The requisites of an equitable estoppel are: (1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party from allowing the first party to contradict or repudiate such admission, statement, or act. *See Bignold v. King Cy.*, 65 Wn.2d 817, 399 P.2d 611 (1965); *Moore v. Dark*, 52 Wn.2d 555, 327 P.2d 429 (1958); *Nelson v. Bailey*, 54 Wn.2d 161, 338 P.2d 757 (1959).

*Carstens,* 68 Wash. 176, 122 Pac. 999 (1912); *Spokane Street Ry. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072 (1893).

This court, has long recognized that in determining what acts of a governing body are ultra vires and void, and thus immune from the application of the doctrine of equitable estoppel, it must distinguish those acts which are done wholly without legal authorization or in direct violation of existing statutes, from those acts which are within the scope of the broad governmental powers conferred, granted or delegated, but which powers have been exercised in an irregular manner or through unauthorized procedural means. In *State v. Pullman,* 23 Wash. 583, 592, 63 Pac. 265 (1900), we quoted Herman on Estoppel with approval:

> "The true principle in such cases is well settled that one cannot do indirectly, what cannot be done directly, and, where there is no power or authority vested by law in officers or agents, no void act of theirs can be cured by aid of the doctrine of estoppel. Where there is power, and it is irregularly exercised, or there are defects and omissions in exercising the authority conferred by law, the doctrine of equitable estoppel may well be applied by courts."

In *Franklin Cy. v. Carstens, supra,* we find a situation somewhat comparable to the instant case. The county had foreclosed its tax lien and acquired property in satisfaction of its judgment of foreclosure. Thereafter, the county commissioners made a compromise settlement of the prior tax liability of the former owner, and without legal authority, conveyed the property to the former owner in consideration of payment of the reduced and compromised tax liability. A statute required that when the county acquired property through tax foreclosure, it was required to sell the property at public auction. The court said at 179: "It is conceded that this statute was not complied with." There being strong equitable considerations, however, why the compromise settlement should be approved, including 7 years lapse of time, during which the owner lost his right to challenge the tax foreclosure proceedings, the court approved the compromise settlement. In rejecting the claim

that the county's action was ultra vires, and therefore void, the court, at 184, pointed to the broad general powers granted to the county commissioners:

" . . . To have the care of the county property and the management of the county funds and business, and in the name of the county to prosecute and defend all actions for and against the county, and such other powers as are or may be conferred by law."

■ In the instant case, the county commissioners, in making the exchange agreement with Matthews, purported to act within the broad general powers which were in effect at the time of the transaction. Rem. Rev. Stat. § 4056:

The several boards of county commissioners are authorized and required,—

. . . .

2. To lay out, discontinue or alter county roads and highways within their respective counties, and do all other necessary acts relating thereto according to law, except within the limits of incorporated cities and towns, whereby the terms of the acts of incorporation, jurisdiction over the roads in the limits of said incorporations is vested in the corporate authorities thereof; . . . .

The above provision has been carried forward into our present code, RCW 36.32.120(2), and was a part of the general powers vested in the county commissioners under the statute forming the basis for the decision in *Franklin Cy. v. Carstens, supra.*

This statute grants broad general powers to the county commissioners with respect to county roads. The reason why a county may not effectively make an exchange of road rights-of-way for other rights-of-way is not because of any express statutory prohibition, but because of the reason heretofore discussed; namely, the county does not own the fee, under such facts as we have in this case. The city's claim to the property in controversy must be predicated on the fact that the county, without express statutory authorization, exchanged its easement on Indianapolis Street for a road right-of-way over adjoining property. This

was an irregular and unauthorized procedure, rather than an ultra vires act.

The trial court correctly summarized the applicable rule of law in his oral decision:

> As I understand the cases cited by the parties, the doctrine of equitable estoppel will not be applied against a governmental body where the act itself is ultra vires. As I understand it, ultra vires means beyond the power of the governmental body.
>
> Now the arrangement contemplated by the 1928 resolution was not beyond the power of the County to enter into, but it certainly was not properly entered into.

The instant case, in principle, is not dissimilar to *Edwards v. Renton*, 67 Wn.2d 598, 409 P.2d 153 (1965). In that case, the city of Renton made an agreement with the builder of a shopping center, that if the builder would install a traffic signal at the cost of $18,200, at a busy street intersection near the shopping center, the city would reimburse him out of the funds to be included in the budget for the ensuing year. This court held that agreement was illegal because: (1) It constituted, in effect, an agreement by the city to borrow money without statutory authorization. (2) It violated the statute requiring the city to call for bids before letting contracts for such municipal improvements. (3) It violated the statute making expenditure of municipal funds or the incurring of liabilities illegal, if the items of expenditure were not included in the current city budget.

Notwithstanding such illegality, the court required the city to reimburse the builder for the reasonable value of the traffic light, by the application of equitable principles, more particularly, the doctrine of unjust enrichment. The court quoted with approval at 604 from *Abrams v. Seattle*, 173 Wash. 495, 23 P.2d 869 (1933):

> "This court has endeavored to hold municipalities to the same standard of right and wrong that the law imposes upon individuals. *Franklin County v. Carstens*, 68 Wash. 176, 122 Pac. 999; *Coliseum Inv. Co. v. King County*, 72 Wash. 687, 131 Pac. 245; *State ex rel. Maddaugh v. Ritter*, 74 Wash. 649, 134 Pac. 492; *Ettor v. Tacoma*, 77 Wash. 267, 137 Pac. 820. . . ."

The court in *Edwards v. Renton, supra,* found that, notwithstanding the illegal nature of the agreement with the builder, the installation of the traffic signal was within the broad general powers of the municipality, and there was no evidence of "bad faith, fraud or collusion," and that the city's acts were not malum in se, malum prohibitum, or against public policy. The same may be said of King County's actions in 1928. The *Edwards* case, *supra,* is based on the doctrine of unjust enrichment. In the instant case, the city of Seattle asks this court to approve the unjust enrichment it would obtain through the plaintiffs' substantial improvements of the lot, and the enrichment obtained by the grant of a usable road right-of-way for one which was then almost worthless. This we will not do.

■ We have never departed from the broad equitable principle stated in *State ex rel. Washington Paving Co. v. Clausen,* 90 Wash. 450, 452, 156 Pac. 554 (1916):

> We have repeatedly held that, in its business relations with individuals, the state must not expect more favorable treatment than is fair between men. *State ex rel. Gillett v. Clausen,* 44 Wash. 437, 87 Pac. 498; *Spokane Street R. Co. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072; *State ex rel. Maddaugh v. Ritter,* 74 Wash. 649, 134 Pac. 492; *Ettor v. Tacoma,* 77 Wash. 267, 137 Pac. 820. The state, in its dealings with individuals, should be held to "resolute good faith." *State v. Milk,* 11 Fed. 389.

The doctrine of equitable estoppel will be applied against the state or against a municipality or other political entity when acting in its governmental as well as when acting in its proprietary capacity, when necessary to prevent a *manifest injustice* and the exercise of its governmental powers will not be impaired thereby. 31 C.J.S. *Estoppel* § 141 (1964). In *Bennett v. Grays Harbor Cy.,* 15 Wn.2d 331, 130 P.2d 1041 (1942), the facts presented did not warrant a finding of manifest injustice, but the rule was correctly stated. It appears unlikely that any state of facts will be presented to this court which would impose more manifest injustice upon a citizen than the disposition which the city seeks of this case.

Governmental immunity from estoppel is a derivative of the doctrine conferring the sovereign entity with immunity from suit without its consent. 28 Am. Jur. 2d *Estoppel and Waiver* § 123 (1966); Annot. 1 A.L.R. 2d 338, 340 (1949); *Hickey v. Illinois Central R.R.,* 35 Ill. 2d 427, 220 N.E.2d 415 (1966). The legislature of this state has indicated that sovereign immunity in tort actions is no longer desirable or acceptable. RCW 4.92.090. The modern trend in both legislative and judicial thinking is toward the concept that the citizen has a right to expect the same standard of honesty, justice and fair dealing in his contact with the state or other political entity, which he is legally accorded in his dealing with other individuals. Therefore, the rule against estopping a governmental body should not be used as a device by a municipality to obtain unjust enrichment or dishonest gains at the expense of a citizen. *State ex rel. Washington Paving Co. v. Clausen, supra; Mallory v. Olympia,* 83 Wash. 499, 145 Pac. 627 (1915); *Ettor v. Tacoma,* 77 Wash. 267, 137 Pac. 820 (1914); *State ex rel. Maddaugh v. Ritter,* 74 Wash. 649, 134 Pac. 492 (1913); *Edwards v. Renton, supra.*

The overwhelming equities in favor of the plaintiffs, under the facts of this case, are such that the city must be deemed estopped to assert that its claim to the property is superior to that of the plaintiffs, and the judgment must be affirmed.

It is so ordered.

FINLEY, C. J., HUNTER and HAMILTON, JJ., concur.

NEILL, J., concurs in the result.