[No. 43481.    En Banc.    September 18, 1975.]

METROPOLITAN PARK DISTRICT OF TACOMA, *Respondent*, v. THE STATE OF WASHINGTON *et al, Appellants.*

822

*Slade Gorton, Attorney General,* and *Theodore O. Torve, Assistant,* for appellants.

*Herbert Gelman* and *Gelman & Couture,* for respondent.

HUNTER, J.—This case involves the right of the State of Washington, appellant herein, to cancel a use deed granted to the Metropolitan Park District of Tacoma, respondent (hereinafter referred to as the District), for the use of certain tidelands.

In 1916, the Tacoma Yacht Club acquired certain properties on Puget Sound in the city of Tacoma somewhat adjacent to the Tacoma Smelter and Point Defiance Park. The property had come into existence due to the dumping of slag into the water by the Tacoma Smelter, eventually causing the formation of a spit on the existing tidelands. The tidelands and the newly formed spit were originally conveyed, by use deed by the legislature, to the District for park and playground purposes. The District then allowed the Yacht Club to make use of the property for marina purposes. Since that time, with the State's knowledge, the

Yacht Club has provided marine services for its members and the public at large.

In 1931, the Tacoma Yacht Club constructed a clubhouse on the property and, in 1932, the District entered into a formal lease with the Yacht Club in regard to the entire area covered by the use deed. At this time, both the District and the State were under the mistaken belief that the land in question was within the outer harbor limits. The original clubhouse remained on the land acquired under the 1916 use deed until 1971, when the present clubhouse was erected.

In 1961, the State, the District, and the Yacht Club became aware of the fact that the area leased to the club by the District, including all of the slag dump, was outside of the then existing harbor lines. The Harbor Commission platted new lines, which, in effect, created new tidelands over which the State had full ownership. These new tidelands were designated as "Block A," and divided into three tracts: (1) tract 1 was the area in which the old Yacht Club was located, as well as the berths for boats; (2) tract 2 contained principally the slag dump; and (3) tract 3 contained open water, the northeast corner of the slag dump, the public float area, a public launching area, and the Washington State Ferry landing.

Negotiations commenced between the District and the State with a citizen committee being formed in compliance with RCW 79.08.080, the Washington use deed statute, which provides:

> Whenever application is made to the commissoner of public lands by any incorporated city or town or metropolitan park district for the use of any state owned tide or shore lands within the corporate limits of said city or town or metropolitan park district for municipal park and/or playground purposes, he shall cause such application to be entered in the records of his office, and shall then forward the same to the governor, who shall appoint a committee of five representative citizens of said city or town, in addition to the commissioner of public lands and the director of conservation and development, both of whom shall be ex officio members of said committee, to

investigate said lands and determine whether they are suitable and needed for such purposes; and, if they so find, the land commissioner shall certify to the governor that the property shall be deeded to the said city or town or metropolitan park district and the governor shall then execute a deed in the name of the state of Washington, attested by the secretary of state, conveying the use of such lands to said city or town or metropolitan park district for said purposes for so long as it shall continue to hold, use and maintain said lands for such purposes.

The committee made extensive investigations and considered the possibility of selling the tidelands, conveying them by use deed, or some combination of the two. As provided in RCW 79.08.080, Mr. Bert Cole, the Commissioner of Public Lands, did serve as an ex officio member of the committee and, in that capacity, Mr. Cole did view the area under consideration, and did meet with representatives of the District and the Yacht Club in order to discuss their plans. According to the finding of the trial court, supported by the record, the committee was aware, or should have been aware, of the past use of this land, as well as the future plans for expansion by the Yacht Club. Finally, in 1964, the State agreed to sell tracts 1 and 2 to the District for $75,000, and to convey tract 3 to the District under a use deed. This deed was finally executed in January of 1965. The District in return leased the entire area to the Yacht Club under a similar arrangement as that entered into between the parties in 1932. At this time, the Yacht Club and the District were under the belief that all of the slag dump was contained in those tracts purchased by the District, since otherwise the tip of the slag dump would be landlocked.

In 1971, 8 months after the Yacht Club had commenced construction of a new $350,000 clubhouse on the tip of the slag dump, a title search revealed that this area fell within tract 3 and was owned by the State and covered by the use deed. Upon notifying the Commissioner of Public Lands of the mistake, the commissioner caused an order to be issued which cancelled the use deed based on his contention that

the Yacht Club's clubhouse facilities did not comply with the provisions of RCW 79.08.080. Two months later, the commissioner's office notified the Yacht Club that the State was willing to rent the area' to the Yacht Club for $6,276 per year.

In 1973, following a series of injunctions, the matter came to trial in the Superior Court for Pierce County. The trial court, while refusing to reform the deed for tracts 1 and 2, to include the entire slag dump, held that RCW 79.08.080 had not been violated by the existence of the clubhouse and other Yacht Club facilities, and, irrespective of this, that the State was estopped to plead an illegal use of the property as a basis for the cancellation order. Finally, the court held that the State was enjoined from interfering with the District's use of the property and their rental arrangement with the Yacht Club. From that decision, the State brings this appeal.

The State contends that the trial court erred in estopping it from asserting purported violations of the statutory purposes of RCW 79.08.080, as grounds for cancelling the 1965 use deed. The State argues that the initial issuance of a use deed constituted an ultra vires act contrary to the statute. This position is without merit.

Ultra vires acts are those done "wholly without legal authorization or in direct violation of existing statutes , . ." *Finch v. Matthews*, 74 Wn.2d 161, 172, 443 P.2d 833 (1968). RCW 79.08.080 establishes legal authorization for the issuances of use deeds. It provides that when an application is made, the Governor shall appoint a 5-man citizen committee to investigate into the merits of the application in order that it can determine whether the deed should be granted. If the committee satisfies itself that the application meets the requirements, it certifies the same to the Governor who shall execute the deed. This statutory procedure was fully complied with and the committee empowered to make the requisite certification exercised its legal authority in the statutory manner. The accuracy of that committee's

determination may be subject to debate, but that factor does not in any way affect its *authority* to make it. Therefore, we hold that the use deed in question did not result from ultra vires conduct in derogation of statutory authority.

■ Initially, the State contends that the theory of equitable estoppel is inapplicable since the issuance of the use deed was predicated on a mistake of law. We disagree. This is not a case where a public official acted without authority or made an erroneous statement of law upon which a party unjustifiably relied. *See, e.g., State v. Northwest Magnesite Co.*, 28 Wn.2d 1, 182 P.2d 643 (1947). As stated earlier in this opinion, the citizen committee was fully authorized to review the District's application and certify its findings to the Governor. Furthermore, there was never any legal question as to whether the District had to comply with the requirements of RCW 79.08.080, or what those requirements were. Arguably, the committee might have erred in determining that the District's intended use qualified for a use deed. However, if such a mistake did occur, it was the result of an error in judgment, as opposed to a misconception or misinterpretation of the law. Therefore, the ultimate decision to issue a use deed was premised on the *factual* determination that the District complied with the applicable law, and the District was fully justified in relying on that decision. *State ex rel. Shannon v. Sponburgh*, 66 Wn.2d 135, 401 P.2d 635 (1965).

The State next attacks the application of the doctrine of equitable estoppel to the facts of this case on the grounds that its application will limit a public right—the free and unlimited use of public parks and playgrounds. The State argues that it cannot be estopped from ending what it considers to be an unlawful use of the property, specifically, the District's leasing of the area to the Yacht Club for mixed private and public purposes.

We need not reach the question of whether the land is, in fact, being utilized for public purposes, since this is not a case of this court interfering with the State's termination of

a purported unlawful use. The State does not now, nor has it ever, intended to terminate the Yacht Club's activities. Rather, the State would, by its action, regain control of tract 3, and be the recipient of the revenues generated from the lease on tract 3. This is verified by the letter of December 3, 1971, written by the State to the Yacht Club, offering to lease the same property for $6,276. To summarize, this is not a case of terminating a purported unlawful use, but rather, an attempt to change control of the use. Since the public will not benefit from such an alteration in control over the property, the State cannot assert the public interest as a basis for preventing the District from asserting the doctrine of equitable estoppel.

We turn now to the fundamental issue of whether the State should, in fact, be estopped from alleging purported violations of the statutory purposes of RCW 79.08.080 as grounds for cancelling the use deed. We conclude that the doctrine does preclude the State from making the above mentioned assertions.

We fully recognize that this court must be cautious in applying equitable estoppel against the State, especially when the State is functioning in its governmental, as opposed to proprietary capacity. *PUD 1 v. Cooper*, 69 Wn.2d 909, 421 P.2d 1002 (1966). However, when the State undertakes to dispose of public lands, either by lease or sale, it then acts in its proprietary capacity. *Strand v. State*, 16 Wn.2d 107, 132 P.2d 1011 (1943). Furthermore:

> The doctrine of equitable estoppel will be applied against the state or against a municipality or other political entity when acting in its governmental as well as when acting in its proprietary capacity, when necessary to prevent a *manifest injustice* and the exercise of its governmental powers will not be impaired thereby.

*Finch v. Matthews, supra* at 175. In addition to these fundamental considerations, before a party will be estopped from making out his case without any legal limitations, the proponent of the doctrine must clearly show:

(1) an admission, statement, or act, inconsistent with the

claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party arising from permitting the first party to contradict or repudiate such admission, statement, or act.

*Shafer v. State*, 83 Wn.2d 618, 623, 521 P.2d 736 (1974).

Applying these three requisite criteria to the instant case, we believe the trial court correctly found that the State granted the District a use deed in 1965, with either actual or constructive knowledge of the intended use to which the property would be put, including the Yacht Club's intention to expand its clubhouse facilities. This finding is supported by the fact that the District had leased the property to the Yacht Club since 1932, under a similar use deed as that granted in 1965, for the substantially same purposes. Also, the appointed citizen committee made a thorough investigation and had all relevant facts before it prior to certifying to the Governor that the deed should be granted. Secondly, the record discloses that in reliance on the use deed, the District did purchase two tracts of land from the State and entered into a new lease with the Tacoma Yacht Club, and furthermore, the District used this new lease as collateral to procure a loan of $75,000 in order to buy the other two tracts of land. Finally, the third criteria, requiring injury to the relying party, is met in several ways: (1) the District will lose its collateral for the loan; (2) it will lose its reversionary interest in all of the Yacht Club's facilities which, under the lease, reverts to the District upon expiration of the lease; and (3) it will lose the revenue generated by the lease which supports other park and playground facilities within the District's jurisdiction. These facts clearly meet the requisites for applying the doctrine of equitable estoppel to this case. It must be remembered that when the State functions in its proprietary capacity, it will receive no better treatment than any two private individuals who bring their dispute before the courts for final resolution. *State ex rel. Washington Paving*

*Co. v. Clausen,* 90 Wash. 450, 156 P. 554 (1916); *Finch v. Matthews, supra.* In fact:

> The conduct of government should always be scrupulously just in dealing with its citizens; and where a public official, acting within his authority and with knowledge of the pertinent facts, has made a commitment and the party to whom it was made has acted to his detriment in reliance on that commitment, the official should not be permitted to revoke that commitment.

*State ex rel. Shannon v. Sponburgh,* 66 Wn.2d 135, 143-44, 401 P.2d 635 (1965). Therefore, it is evident that more forthrightness is demanded of the State than of the average citizen. In the instant case, such a commitment was made by the State and detrimentally relied upon by the District. It would be both inequitable and grossly unconscionable to now allow the State, under the facts of this case, to rescind that commitment.

The judgment of the trial court is affirmed.

FINLEY, ROSELLINI, HAMILTON, and WRIGHT, JJ., and HENRY, J. Pro Tem., concur.

HOROWITZ, J. (dissenting)—The court rejects the State's contention estoppel does not apply to prevent the State from enforcing the use deed restrictions required by RCW 79.08.080. The use deed in conformity with the statute provides:

> The use of the foregoing property is conveyed for *municipal park and playground purposes only.* This conveyance shall remain in full force and effect only for such period as the grantee shall continue to hold, use, and maintain the property for municipal park and playground purposes. *Should the grantee cease to use the property for such purposes or permit the use of the property, or any portion of it, for any other purpose, the grantor may enter and terminate the grantee's use.*

(Italics mine.)

The State does not contend the facilities provided violated the italicized restrictions. The State contends, rather,

the Park District and its lessee Tacoma Yacht Club violated those restrictions when the club, with the authority of the park board, erected a private clubhouse on the use deed land for the benefit of its members and such others as the club, in its discretion, permitted. To support its contention the club is a private one, the State relies heavily upon articles 5 and 6 of the club by-laws dealing with membership requirements pertinent parts of which are set forth in the margin.[1]

The State points out the club's by-laws permit members to be selected in such a way as to either keep out or

---

[1] ARTICLE 5, Membership, Fees and Dues, provides in part:

"Section 1. Membership of all classes shall be by invitation only. Any male or female person, who is a citizen of the United States or of a friendly country at peace with the United States, over the age of twenty-one (21) years, of good moral character, may be extended an invitation to join this Club.

". . .

"Section 3. (a) Active Membership shall consist of male members of at least twenty-one years of age who are the bona fide owners of at least a half interest in any vessel. . . . Active Members shall pay an initiation fee of Two Hundred Dollars ($200.00) and any State or Federal Tax. Thereafter dues shall become payable . . . at the rate of Forty-Two Dollars ($42.00) per annum. Active Members shall be the voting members of this Club . . .

". . .

"(d) Associate Membership. Persons with, or without boat ownership, but otherwise qualified to be Active Members, may be invited to Associate Membership. Associate Members shall be entitled to the privileges of the Club House, grounds, and to the social activities of the Club, but shall not be eligible to attend business meetings except as the guest of an Active Member, or to vote, or to moorage privileges or the Club Pennant. Associate Members shall pay an initiation fee of One Hundred Dollars ($100.00) and dues in the same amount, time and manner as Active Members. . . ."

ARTICLE 6, Invitations for Membership, provides in part:

"Section 1. Invitees for all classes of membership must be proposed in writing by one member and seconded by another, on suitable invitation forms provided by the Club. Except that no Invitee for Active Membership shall be considered or admitted to membership unless his sponsor shall certify that he has introduced the invitee at at least one meeting of the Club, either General or Dinner Discussion Meeting, and recorded by the Secretary or Presiding Officer, and shall be within three months next preceding the proposal. The introduction, when necessary, may be omitted by action of the Board of Trustees.

discourage from applying, those persons the membership does not like for whatever reason. A single negative vote by any club member renders the applicant, no matter how worthy, ineligible for membership.

Such membership requirements are capable of masking statutorily prohibited discrimination. RCW 49.60.010 states:

> The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, sex, marital status, age, or the presence of any sensory, mental, or physical handicap are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

Moreover, RCW 49.60.030 creates as a civil right

> (b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement;

Only an active member may vote and active membership is restricted to male members. Article 5, section 3(a).

The park board and club contend in practice, however, club members and nonmembers have essentially the same privileges; that the club practices no discrimination, actual or covert. Furthermore, the club lease, from the park board dated July 1, 1964, expressly provides in paragraph 5(6):

> Second party (club), in the use of said premises, shall

---

The name of the proposed Invitee, together with the name of his sponsor and second shall be posted on the bulletin board at the Club House for at least two weeks before any action may be taken by the Board of Trustees.

"Section 2. As soon as the written proposal, so signed and certified, is received, it shall be referred to the Membership Committee which shall conduct a careful investigation into the desirability of the proposed Invitee from all standpoints and report in writing to the Board of Trustees.

"Section 3. When the requirements of Sections 1 and 2 of this Article have been fulfilled, the Board of Trustees shall invite the proposed Invitee to membership by an unanimous vote, refer it to a committee appointed by the Commodore, or back to the Membership Committee for further investigation, or reject it."

not discriminate against any person because of race, creed, color, or national origin.

The State responding argues this provision does not make the club any less a private club; that the club's by-laws do not permit any member of the public to be accepted for membership without the overhanging threat of a blackball by a single member for whatever reason. More-over, the State points out the club voluntarily applied for and obtained a class H liquor license to serve liquor by the drink to members and their guests; that such a license is illustrative of the club's private character whether or not in other respects it maintains that character in practice.

The majority opinion does not state it disagrees with the State's contention the control of the park and playground purposes if given to a private club with the membership restriction described, constitutes a violation of the use deed restrictions. Instead, the majority opinion agrees with the park board and club that the State is estopped to enforce the use deed restrictions imposed pursuant to RCW 79.08.080.

The estoppel is said to arise because the Governor's com-mittee charged by RCW 79.08.080 with the responsibility for making recommendations to the Governor on whether the use deed should be given to the park board, knew, or should have known, the park board intended to permit the Tacoma Yacht Club to use the use deed property for a clubhouse in aid of the club's program and made no objec-tions to the private character of the club and its private club membership requirements. The park board and club contend they thereafter relied in good faith upon the con-tinued validity of the use deed; that in so relying the club, with no objection from the park board or the State, in-curred substantial mortgage indebtedness and expense which would not have otherwise been incurred; that this prejudicial change of position requires the State be es-topped to now cancel the use deed.

The difficulty with applying the estoppel claimed as

against the State is that legally justifiable reliance is lacking here. *Leonard v. Washington Employers, Inc.*, 77 Wn.2d 271, 280-81, 461 P.2d 538 (1969). The court there said:

> Not all those who rely upon another's conduct or statements may raise an estoppel. Rather, it is only those who have a *right to rely* upon such acts or representations . . .
>
> . . . . [A]bsent fraud or misrepresentation, estoppel runs in favor only of those who have reasonably relied on another's conduct or declarations.

*State v. Northwest Magnesite Co.*, 28 Wn.2d 1, 24, 182 P.2d 643 (1947), when holding that an erroneous opinion on the law expressed by a public official was not sufficient to create an estoppel, stated: "[S]uch expression of opinion as to the law, the facts being equally well known to both parties, cannot preclude the state from asserting the true effect of the statutes . . ."

In the instant case, during the negotiations leading up to the gift of the use deed to the park board, the State and the park board were each represented by counsel. In the earlier lease negotiation between the park board and the club, each party was also represented by counsel. All attorneys were able and experienced. Each of the represented parties was charged with knowledge of the meaning of RCW 79.08.080 and the use deed restrictions. The park board and the club knew, or should have known, the State had no power to convey State lands governed by RCW 79.08.080 for use by a private club with private club restrictive membership requirements such as those contained in articles 5 and 6 of its by-laws. The rationale of the following cases support this view. *Lancaster v. Columbus*, 333 F. Supp. 1012 (N.D. Miss. 1971); *Fairhope Single Tax Corp. v. Fairhope*, 281 Ala. 576, 206 So. 2d 588 (1968); *Norton v. Gainesville*, 211 Ga. 387, 86 S.E.2d 234 (1955); *Lincoln Park Traps v. Chicago Park Dist.*, 323 Ill. App. 107, 55 N.E.2d 173 (1944); *Board of Mayor & Aldermen v. Wilson*, 232 Miss. 435. 99 So. 2d 674 (1958); *Gallagher v. Omaha*, 189 Neb.

598, 204 N.W.2d 157 (1973); *Nebraska City v. Nebraska City Speed & Fair Ass'n*, 107 Neb. 576, 186 N.W. 374 (1922).

Moreover, they knew or should have known that as against the State it was beyond the power of any private citizen or public official to change the statute or abrogate the provisions of the use deed by interpretation or otherwise, and either intentionally or by mistake. *See State v. Northwest Magnesite Co., supra.*

The fact that the private club also permits its facilities to be used by the public generally, or for purposes which fall within the statutory use restrictions imposed upon the property, makes no difference. *Lincoln Park Traps v. Chicago Park Dist., supra.*

It does not follow, however, that because estoppel is unavailable here, cancellation of the use deed must follow. The evidence shows that for many years before the issuance of the use deed in 1965, the park board and its lessee, Tacoma Yacht Club, enjoyed a relationship characterized by the genuine desire of the park board and club to render a maximum service to the public, the park board itself was financially unable to render. Significantly, according to the record, the Tacoma Yacht Club, while retaining its restrictive by-law membership requirements, appears to have made a conscientious effort in good faith not to exclude anyone from membership who was morally entitled thereto upon payment of the required reasonable initiation fee and dues. So far as the record shows, except for liquor service, the facilities of the club have been made available to nonmembers as well as members on substantially equal terms. There is no evidence the Governor's committee with actual or constructive knowledge of the club's membership requirements considered or told the park board those requirements violated the use deed restrictions. There is little question the park board and the club, in good faith, although mistakenly, believed the use deed restrictions had not been breached and that in reliance on the continued

validity of the use deed the club substantially changed its position by incurring large mortgage indebtedness and expense in building its new club house and improving the club facilities. Under these circumstances, to deny the validity of the use deed would promote gross inequity even though the defense of estoppel is unavailable.

If estoppel is inapplicable, a court of equity may still fashion its decree to eliminate inequitable hardship in the furtherance of public interest. This can be done by applying the long-recognized doctrine of equitable conditions, imposed pursuant to the maxim that he who seeks equity must do equity. *See Seattle v. P.B. Inv. Co.*, 11 Wn. App. 653, 524 P.2d 419 (1974) in which the court stated at pages 664-65:

> [S]hould the trial court determine that the strict elements of equitable estoppel are not present, it may consider whether or not relief might be granted to P. B. Investment under the maxim, "He who seeks equity must do equity." Thus, the trial court may deem it appropriate to impose conditions upon its grant of equitable relief to the City.

*See generally* H. McClintock, *Principles of Equity* § 25 (2d ed. 1948); 30 C.J.S. *Equity* §§ 90-92 (1965).

Each party seeks equitable relief. The park board and its lessee, the Tacoma Yacht Club, are cooperating to seek injunctive relief against the State's cancellation of the use deed. The State seeks a decree upholding its cancellation of the use deed. Alternatively, the State prays that if cancellation is not upheld, the court enter an order requiring the park board exercise its rights in use deed property solely for public park purposes.

I would conditionally grant the injunctive relief sought (and also grant the State's alternative prayer for relief) as a proper application of the doctrine of equitable conditions to insure fair access without discrimination to all who wish to make use of the use deed property for "municipal park and playground purposes." I would also remand this case for further hearing, upon notice to the interested parties, to

determine the precise conditions to be imposed with respect to membership by-law requirements and the use of facilities in conformity with this opinion.

STAFFORD, C.J., and BRACHTENBACH, J., concur with HOROWITZ, J.

Petition for rehearing denied January 9, 1976.