
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 MAY 13 AM 8: 32

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RAINIER DISPATCH, LLC, a Washington limited liability company, | ) ) ) | No. 67721-7-I |
| Plaintiff, | ) ) | DIVISION ONE |
| v. | ) ) | |
| PORT OF SEATTLE, a municipal corporation; | ) ) ) | |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| AIRPORT JOINT VENTURE RESPONSE PARTNERSHIP, LLC, an unincorporated entity; CHECKER CAB OF SEATAC CORPORATION, a Washington corporation; ORANGE CAB COMPANY, a Washington corporation; PUGET SOUND DISPATCH, LLC d/b/a YELLOW TAXI ASSOCIATION, a Washington limited liability company, | ) ) ) ) ) ) ) ) ) | FILED: May 13, 2013 |
| Defendants, | ) ) | |
| and | ) ) | |
| SEATTLE-TACOMA INTERNA- TIONAL TAXI ASSOCIATION, a Washington nonprofit association, | ) ) ) ) | |
| Appellant. | ) ) | |

BECKER, J. — This appeal involves the decision by the Port of Seattle to

award a five-year exclusive taxi concession at Sea-Tac International Airport to a

competitor of appellant Seattle-Tacoma International Taxi Association. Where a request for competitive bids reserves to the issuing agency the right to negotiate contract terms after selecting a bidder, and no competitive bidding statute controls, a properly authorized contract is not ultra vires merely because some contract terms differ from the original bid. We affirm the order of summary judgment dismissing the Taxi Association's claims against the Port.

FACTS

In 1989, the Taxi Association obtained an exclusive concession for providing on-demand taxi services at Sea-Tac airport. Twenty years later, the Port sought competitive bids for the airport taxi concession. The Port issued a request for proposals and received six responses. After evaluating the proposals, port staff recommended approval of the bid by Puget Sound Dispatch LLC d/b/a Yellow Taxi Association, commonly known as Yellow Cab. At a public meeting on December 15, 2009, the port commission voted 4 to 1 in favor of Yellow Cab.

In January 2010, before the Port and Yellow Cab signed the final contract, the Taxi Association filed suit claiming the request for proposals was illegal and requesting injunctions against any contract executed in reliance on it. The trial court denied the injunction. The Taxi Association appealed. We affirmed. Seattle-Tacoma Int'l Taxi Ass'n v. Port of Seattle (Taxi Ass'n 1), noted at 156 Wn. App. 1025, review denied, 169 Wn.2d 1016 (2010). Later, we affirmed the trial court's disbursement of a supersedeas bond of $144,000 posted by the Taxi

Association to compensate the Port in part for approximately $400,000 in revenue the Port lost as a result of the Taxi Association's lawsuit. Seattle-Tacoma Int'l Taxi Ass'n v. Port of Seattle (Taxi Ass'n 2), noted at 168 Wn. App. 1036 (2012).

While these matters were on appeal, the Taxi Association filed cross claims in a second lawsuit against the Port initiated by another unsuccessful bidder. Those cross claims were dismissed on summary judgment. In this appeal, the Taxi Association contends there are issues of fact bearing on the legality of the port commission's December 2009 decision to award the taxi concession to Yellow Cab, as well as the legality of the contract the Port negotiated and entered with Yellow Cab in August 2010.

We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We construe the evidence and inferences from the evidence in favor of the nonmoving party—here, the Taxi Association. Marquis, 130 Wn.2d at 105.

OPEN PUBLIC MEETINGS ACT

The Taxi Association contends the award of the concession to Yellow Cab was invalid because the Port violated the Open Public Meetings Act of 1971, chapter 42.30 RCW, in reaching its decision. The Port contends this argument is

3

barred by res judicata. Also known as claim preclusion, res judicata bars litigation of a claim that either was, or should have been, raised and litigated in a former action. Loveridge v. Fred Meyer, Inc., 125 Wn.2d 759, 763, 887 P.2d 898 (1995). When the parties to two successive proceedings are the same and the prior proceeding culminated in a final judgment, a matter "may not be relitigated, or even litigated for the first time, if it could have been raised, and in the exercise of reasonable diligence should have been raised, in the prior proceeding." Sound Built Homes, Inc. v. Windermere Real Estate/S., Inc., 118 Wn. App. 617, 627-28, 72 P.3d 788 (2003).

In both proceedings, the Taxi Association filed claims against the Port for the purpose of invalidating the Port's concession to Yellow Cab. This court's decision in Taxi Ass'n 1 constituted a final judgment on the merits of the Taxi Association's first lawsuit against the Port. See Taxi Ass'n 1, at *7. The question is whether the open meetings claims could and should have been raised in the first lawsuit.

The Open Public Meetings Act of 1974 requires that all "meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency." RCW 42.30.030. Any action taken at a meeting that fails to comply with the Act is "null and void." RCW 42.30.060(1). The Act defines "action" to include deliberations, discussions, considerations, reviews, and evaluations of an issue under consideration. RCW 42.30.020(3). The Taxi Association claims the Port

4

violated the Act (1) when a committee of port staff evaluated and scored the proposals in private, (2) when commissioners failed to rescore the proposals during the public meeting and thereby rested on the staff's privately generated recommendations, and (3) when port commissioners discussed the taxi concession privately in e-mails before the December 2009 public meeting.

The first two theories rested on information the Taxi Association already possessed when it filed its first suit in January 2010. The Taxi Association knew from early in the bidding process that port staff would be privately evaluating the proposals. The Port openly disclosed the evaluation and scoring process to prospective proposers, and identified the five members of the evaluation committee. A few days before the December 2009 public meeting, the Port wrote each bidder a letter stating that it had "completed its evaluation of the six proposals" and attached a score sheet reflecting Yellow Cab as the winner. No effort was made to hide the fact that port staff had evaluated the proposals during private sessions.

The Taxi Association also knew by the conclusion of the December 2009 meeting that the commissioners, before voting to award the concession to Yellow Cab, had not themselves rescored the six proposals during the public meeting. It was apparent at the meeting that at least some of the commissioners felt obligated to follow the privately generated recommendation of the staff evaluation committee. One commissioner stated on the record at the December 2009 meeting: "I think it's dangerous to open the door to anything except doing what it

5

looks as if this has led us to, which is to approve the process." Another commissioner remarked that because it appeared the competitive process had been carried out in a legal fashion, "then I don't think for myself I have much choice but to move ahead and approve the contract."

Because the Taxi Association knew by the end of the public meeting in December 2009 that port staff had evaluated and scored the proposals during private meetings and that the commissioners did not do their own scoring, these two claims could have been raised in the first lawsuit as a basis for invalidating the decision to award the concession to Yellow Cab. And these first two theories are so closely related to the underlying transaction—the Port's competitive bidding process—that they should have been raised in that lawsuit. See Sound Built Homes, Inc., 118 Wn. App. at 629-32; cf. Hayes v. City of Seattle, 131 Wn.2d 706, 713, 934 P.2d 1179, 943 P.2d 265 (1997) (an action focused on the city council's decision making process is distinct from a claim for money damages).

The third theory is that port commissioners committed an open meetings violation when they deliberated privately over e-mails in the weeks leading up to the December 2009 meeting. This theory is based on information the Taxi Association obtained through public records requests only after the decision in the first lawsuit was already on appeal. It could not have been raised in that lawsuit.

The Port contends the e-mails reflect only a discussion as to whether to

place the taxi concession on the meeting's agenda. But a reasonable jury could find that the e-mails reveal the commissioners having substantive private deliberations about the taxi concession, in violation of the Act's requirement that all meetings be open. For example, in one e-mail, Commissioner Pat Davis wrote that she and two other commissioners (a quorum of the five) "agree that the commission cannot do anything about the outcome of the decision, because it has gone through all the procedural and legal hoops. It is ripe for approval. We cannot change the process, the elements, or the evaluation committee's selection."

Nevertheless, even if the open meetings claim based on these e-mails is not barred by res judicata, the claim does not warrant a trial. An action taken at a private meeting is null and void under the Act. But a later final action taken in compliance with the statute is not necessarily null and void. Org. to Pres. Agric. Lands v. Adams County (OPAL), 128 Wn.2d 869, 883-84, 913 P.2d 793 (1996). In OPAL, the trial court found two out of three county commissioners discussed in private how they would vote on an issue at an upcoming meeting. OPAL, 128 Wn.2d at 881-82. The Supreme Court deemed the private discussions "irrelevant because the final vote occurred in a proper, open public meeting." OPAL, 128 Wn.2d at 883. The private discussion was minimal, and because there was extensive opportunity for the opposing parties to provide input at the public meeting, the Supreme Court did not accept the appellant's characterization of the public meeting as one "in which formal action is merely

7

summary approval of decisions made in numerous and detailed secret meetings." OPAL, 128 Wn.2d at 884; see also Eugster v. City of Spokane, 118 Wn. App. 383, 423, 76 P.3d 741 (2003) (no violation where private meetings were followed by public meeting which included "a great deal of public comment, both for and against the project," with much of the opposing comment coming from the plaintiff), review denied, 151 Wn.2d 1027 (2004).

The court may grant a summary judgment motion if, from all the evidence, reasonable minds could reach but one conclusion. Heath v. Uraga, 106 Wn. App. 506, 513, 24 P.3d 413 (2001), review denied, 145 Wn.2d 1016 (2002). The Taxi Association contends a reasonable mind could perceive the public meeting as merely a ceremony concealing that the final decision had already been reached in earlier private deliberations. The record does not support that view. At the public meeting, the port commission engaged in lengthy consideration of the taxi concession. For about two hours, the commissioners heard presentations by port staff, reviewed documents, took 31 public comments (including 26 comments from representatives of the Taxi Association), and debated the matter on the record. A reasonable juror could not fail to conclude that before the commission took final action, the Taxi Association was, like the appellants in OPAL, given a full opportunity to express its views in a public meeting that was genuinely open.

PORT'S AUTHORITY TO NEGOTIATE CONTRACT

The Taxi Association contends the contract the Port negotiated with

Yellow Cab is a nullity because it was ultra vires.

Ultra vires acts are those done wholly without legal authorization or in direct violation of existing statutes. Metro. Park Dist. v. State, 85 Wn.2d 821, 825, 539 P.2d 854 (1975). They are characterized as void "on the basis that no power to act existed, even where proper procedural requirements are followed." S. Tacoma Way, LLC v. State, 169 Wn.2d 118, 123, 233 P.3d 871 (2010); see also Haslund v. City of Seattle, 86 Wn.2d 607, 622, 547 P.2d 1221 (1976) ("An ultra vires act is one performed without any authority to act on the subject."). Whether an action is ultra vires is a question of law we review de novo. Dept. of Transp. v. Marine Emps. Comm'n, 167 Wn. App. 827, 835, 274 P.3d 1094 (2012).

The request for proposals stated that the successful bidder would be required to enter an exclusive contract with the Port, "substantially in the form" of a sample agreement that was attached. After the commission voted to award Yellow Cab the concession, the Port and Yellow Cab privately negotiated the contract terms. Changes were made to a number of items in the sample agreement.

The Taxi Association argues the final contract terms changed so much that they represent a material departure from what Yellow Cab promised to offer the Port in its original bid and from what the Port promised—by means of the terms of its request for proposals—to demand from any successful bidder. One new term required the Port to take into consideration Yellow Cab's "good faith

9

efforts" before terminating the contract on the basis of a failure to meet deadhead reduction goals. Another new term was an overall emergency exit clause excusing Yellow Cab from being found in breach if the impediment to performance was "due to causes that are unforeseeable, beyond its reasonable control, and without its fault or negligence." The Taxi Association also finds fault with terms regarding the green fleet requirement, the five minute wait requirement, the overall size of the fleet, and the number of dual-licensed vehicles. The Taxi Association argues that these terms render the contract void because the Port lacked authority to add them.

The Taxi Association does not dispute that the Port's chief executive officer enjoyed statutory authority to privately negotiate and enter into contracts for the airport taxi concession. The Port's chief executive officer exercised this authority for 20 years by entering taxi concession contracts with the Taxi Association. Municipal airport commissions are authorized by statute to "grant concessions" at the airport "by private negotiation and under such terms and conditions that seem just and proper" to the commission. RCW 14.08.120(5). A port district commission is authorized to "delegate" to the managing official of the district "such administerial powers and duties of the commission as it may deem proper for the efficient and proper management of port district operations." RCW 53.12.270. The Port of Seattle Commission has, by resolution, delegated to the chief executive officer of the Port of Seattle the authority "to prepare, negotiate, and manage" all aspects of contracts needed "in order to conduct the Port's

business."

The Taxi Association contends that when the Port committed itself to a competitive bidding process and issued the request for proposals, it gave up the authority to negotiate terms with the successful bidder. We disagree. The request for proposals explicitly reserved the Port's discretion to negotiate the terms of the contract after the concession was awarded. It declared this discretion in no uncertain terms: "The Port *has the right to negotiate fees and other terms it deems appropriate* for the benefit of the Port and the traveling public." (Emphasis added.) Each bidder, including the Taxi Association, was required to attach to its proposal a certification agreeing to this reservation of rights. At the meeting in December 2009, one commissioner clarified on the record that the purpose of the commission's vote on the taxi concession would be to authorize the chief executive officer "to go forward and negotiate the contract." The meeting minutes reflect the commission's expectation that the selected provider and the Port's chief executive officer would "negotiate in good faith" as to the deadheading issue in particular.

In short, the Port had authority to negotiate the contract and the extent of its authority was made clear to all concerned. The Taxi Association's protestations of surprise are not credible. Internal e-mails between Taxi Association representatives and the consultant who prepared the Taxi Association's proposal demonstrate a full awareness and anticipation of further negotiations between the Port and the winning bidder. In one e-mail, the

11

consultant cautioned against the Association's decision to propose a low figure on a key revenue item and then "take their chances with . . . negotiations down the line." The consultant ultimately conceded that he could "see the wisdom" in the Taxi Association's "desire to get the contract *and then iron out the details.*" (Emphasis added.) The consultant remarked that the request for proposals created certain complexities that would make "negotiation more important than ever."

This is not a case like those cited by the Taxi Association, where a competitive bidding law prevents negotiation after a bid is selected because the terms of the winning bid must be incorporated directly into the final contract. See, e.g., Dep't of Lottery v. Gtech Corp., 816 So.2d 648, 652 (Fla. Dist. Ct. App. 2001) (observing that Florida's competitive bidding statute "envisions finalizing an agreement *by turning the winning proposal into a contract.*") (emphasis added), review dismissed as improvidently granted by 822 So.2d 1243 (2002).

This was a competitive bidding process not governed by a binding statute, and the rules are not so strict. In such a case, "while it is true that all who submit proposals must be treated fairly, there is no legal requirement that a final contract must conform to the original RFP." 10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 29:33, at 476 (3d ed. 2009). Because the Port's chief executive officer was "generally authorized" to negotiate contract terms with the winning bidder, the shifting of terms as a result of negotiations could not render the contract ultra vires. See S. Tacoma Way, 169 Wn.2d at 123 ("If . . . the State

12

was generally authorized to sell the surplus property, its act of doing so was not ultra vires.").

Despite the absence of a binding statute, the Taxi Association contends the request for proposals filled this gap by creating a binding framework. The Taxi Association points to section 8 of the request for proposals, which reserved to the Port a broad right of free negotiation in the event that the Port deemed none of the bids acceptable:

> In the event that, in the Port's sole determination, there is not an acceptable response, the Port reserves the right to enter into direct contract negotiations with any party it chooses and on such terms and conditions as shall then be acceptable to the Port, notwithstanding any provisions of this RFP.

The Taxi Association argues this language had the inverse effect of *prohibiting* free negotiation in the event the Port determined there *was* an acceptable response. This interpretation does not withstand scrutiny. Section 8 guaranteed the Port a specific right to "reject" all proposals if none were acceptable. Nothing in that section limited the Port's right to *accept* a proposal and freely negotiate contract terms with the successful bidder. The first line of section 8 declared the Port's right to "accept or reject any or all proposals in their entirety or in part."

The Taxi Association points out that section 8 prohibited the Port from modifying or waiving particular requirements as to one bidder without doing the same for all bidders:

> During the evaluation process, if the Port determines that a particular requirement may be modified or waived, then the requirement(s) will be modified or waived for all Proposers and all proposals will be re-evaluated in light of the change.

13

This provision, however, is irrelevant to the negotiation phase. It applied only during "the evaluation process," before the concession was awarded. It did not require the Port to go back and rescore all six proposals each time the negotiation phase produced a change in the contract terms.

The Taxi Association argues the Port's reservation of its right to freely negotiate "for the benefit of the Port and the traveling public" restricted the Port from agreeing to any contract revision that was favorable to Yellow Cab. This argument misunderstands the basic meaning of a "negotiation." A negotiation is a "consensual bargaining process." BLACK'S LAW DICTIONARY 1136 (9th ed. 2009). Some back and forth, and some lessening of certain strictures as to one or both parties, is to be expected. By reserving its right to negotiate, the Port reserved its right to modify terms to the benefit of either party, not merely to impose unilaterally upon the successful bidder stricter terms than those the bidder originally contemplated.

## CONSTITUTIONAL THEORIES OF ULTRA VIRES ACTION

The Taxi Association argues the Yellow Cab contract was ultra vires for the additional reason that it violated the Taxi Association's due process rights and was an unconstitutional gift of public funds.[1]

---

[1] See WASH. CONST. art. 8, § 7 ("No county, city, town or other municipal corporation shall hereafter give any money, or property . . . to or in aid of any individual, association, company or corporation."); art. 2, § 25 ("The legislature shall never grant any extra compensation to any public officer, agent, employee, servant, or contractor, after the services shall have been rendered, or the contract entered into.").

The due process theory lacks merit. To begin with, the Taxi Association did not possess a constitutionally protected property interest in receiving the concession. In Washington, "a bidder on a public works contract has no constitutionally protected property interest in being awarded a government contract." Quinn Const. Co., LLC v. King County Fire Prot. Dist. No. 26, 111 Wn. App. 19, 32, 44 P.3d 865 (2002).

Nor did the Taxi Association have a protected property interest in the procedures the Port followed in dealing with bidders. See Olim v. Wakinekona, 461 U.S. 238, 250 & n.12, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.") The Taxi Association concedes that the Port followed proper procedures through to the selection of a presumed candidate and obtained Commission approval for that candidate. Brief of Appellant at 31. The Taxi Association's argument is that the Port violated certain procedures during the contract negotiation phase.

This argument fails because there were no prescribed procedures to be followed during the negotiation phase. The request for proposals reserved the Port's discretion to negotiate the contract terms after awarding the concession. The section 8 language requiring the Port to give equal treatment to each bidder in modifying or waiving certain requirements applied exclusively during "the evaluation process," not during the negotiation phase. The Taxi Association plainly understood that a period of negotiation would be available to the winning

15

bidder. During the negotiation phase, any procedural guarantees set forth in section 8 or elsewhere in the request for proposals no longer applied.

The gift of public funds theory likewise lacks merit. The Taxi Association cites no authority for the notion that a gift of public funds results when a final contract differs in some way from a proposed bid. Nothing bound the Port to hold Yellow Cab to each of its original proposal terms during the negotiation phase.

The Taxi Association argues the contract was effectively a gift to Yellow Cab because "all of the contract revisions plainly accrued to Yellow Cab's benefit alone, with no gains to the Port, the traveling public, or the taxpayers." Brief of Appellant at 37. Because the question of relative benefits implicates agency discretion, it is not clear that it would be a proper question for a jury. In any event, many of the supposed "benefits" to Yellow Cab—such as the deferred deadlines for meeting certain fleet requirements—were direct results of the litigation delays caused by the Taxi Association. The Taxi Association cannot be permitted to cause a delay and then cry foul when a competitor is incidentally benefited by revisions made necessary by the delays.

We conclude the Port's decision awarding the concession to Yellow Cab was not invalid, the contract was not ultra vires, and neither action is subject to being voided.

No. 67721-7-I/17

Affirmed.

Becker, J.

WE CONCUR:

Spearman, A.C.J.

Lau, J.

17