[No. 48293-4.   En Banc.   June 3, 1982.]

WILLIAM S. JOHNSON, *Appellant*, v. CENTRAL
VALLEY SCHOOL DISTRICT NO. 356,
*Respondent.*

*Powell & Harnetiaux,* by *Bryan P. Harnetiaux,* for appellant.

*Winston & Cashatt, Robert W. Winston, Jr.,* and *Charles Matthew Andersen,* for respondent.

Rosellini, J.—This suit was brought by a certified teacher seeking damages for denial of a position as tutor–counselor under a federal grant, and mandatory reinstatement to that position.

Central Valley School District had, at the time of this suit, approximately 11,000 students, of which 175 were of Indian descent. In 1977 the school district applied for and was awarded a grant under the Indian Education Act, 20 U.S.C. § 241aa–ff (Supp. 1972). A condition of the grant was that the district commit itself to "utilize the best available talents and resources (including persons from the Indian community)". The grant was made for the benefit of Indian children. The money received from this grant was used to employ the plaintiff, a person of Native American heritage, as a half–time tutor–counselor for the school year 1977–78. His employment was approved by an advisory committee composed of Indian parents, which was formed as a prerequisite to obtaining the funds. The plaintiff was issued a teacher's certificate in 1978 but did not have a counselor's certificate. He was rehired for the same position in 1978–79, when funds had been increased to allow for a ¾–time position. The advisory committee recommended that appointment. Attached to this 1–year contract was a typewritten acknowledgement, signed by the plaintiff, that the contract, being federally funded, was not a continuing one.

During the 2 years that the plaintiff served in this capacity, he was encouraged to complete the requirements for a

counselor's certificate, and before the end of the second year, the school district was notified by the State Superintendent of Public Instruction that the plaintiff was not qualified to perform the duties of a counselor and would be required to obtain a certificate if he was to be hired the next year.

Funding was in doubt for the school year 1979–80, and on May 11, 1979, the district sent the plaintiff a notice of nonrenewal for financial reasons.

When the plaintiff completed his duties for 1978–79, he enrolled in Eastern Washington University graduate school. He completed the requirements for a guidance and counseling certificate and master's degree on August 3, 1979, and a recommendation for his certification was sent by the university to the state superintendent. A copy of this recommendation was delivered to the school district's grant administrator on or before August 10, 1979.

There was evidence that the state superintendent routinely issues certificates upon the recommendation of Eastern Washington University, and there was no reasonable ground to doubt that the plaintiff would receive his certificate in due course, when and if he applied for it.

In the meantime, on May 24, 1979, the school district had received word that it would be awarded a grant for a full–time tutor–counselor for the 1979–80 year, with emphasis on counseling.

The plaintiff was told that if he obtained his counselor's certificate he could apply and would be considered for this position, along with other applicants. The district advertised for applicants, stating that "Indian preference" would be granted. The job announcement stated: "Our deepest concern is the ability of the person selected to effectively work with students and parents within our community." The plaintiff was told that he could apply for the position as late as August 10, 1979. On that date he submitted a written request that he be considered for the position.

Nine persons applied for this position. The applicants were screened independently by the grant administrator,

the personnel manager, and the executive committee of the Central Valley Native American Advisory Committee, and three were selected for interviews, among them the plaintiff. One of these proved to be unqualified. Six members of the advisory committee's executive committee interviewed the applicants on August 21, 1979.[1] The committee members had been instructed that they were at liberty to vote for the applicant whom they found to be the best qualified. Four votes were cast for the plaintiff's remaining competitor, Peter Covella, and one vote was cast for the plaintiff. The chairman abstained. The grant administrator and the personnel manager also independently recommended the appointment of Covella, finding him the best qualified applicant. The board accepted these recommendations.

On September 9, 1979, after the interviews, the employment of Covella, and the beginning of the school year, the plaintiff applied for certification. He was issued a counselor's certificate on October 1, 1979.

The claims of the plaintiff in this action were based on alleged improper delegation of authority, violation of the doctrine of *Peters v. South Kitsap Sch. Dist. 402,* 8 Wn. App. 809, 509 P.2d 67 (1973), breach of a collective bargaining agreement, violation of the Indian Self–Determination Act, 25 U.S.C. §§ 450–450m, and violation of the state Law Against Discrimination.

The court ruled against the plaintiff on all of these except the claim based on the federal statute.

It ordered reinstatement of the plaintiff for the 1980–81 year, and granted him special damages of $17,162.41. It denied his claim for general damages under the federal legislation, finding that he had proved none.

The plaintiff has appealed all of the adverse rulings save the one regarding improper delegation of authority, and the school district has cross–appealed from the judgment

---

[1]Although there were 21 members of the Central Valley Native American Advisory Committee, most of them did not attend meetings or actively participate in the committee's functions.

granting relief under the federal act.

The first question we will examine is whether the district, in choosing the applicant which it found, on the advice of the advisory committee, to be the best qualified, violated 25 U.S.C. § 450e(b) *et seq.* (Indian Self–Determination Act) or RCW 49.60.180 (the state Law Against Discrimination).

25 U.S.C. § 450e(b) provides:

> (b) Any contract, subcontract, grant, or subgrant pursuant to this Act, sections 452 to 457 of this title, or any other Act authorizing Federal contracts with or grants to Indian organizations or for the benefit of Indians, shall require that to the greatest extent feasible—
>
> > (1) preferences and opportunities for training and employment in connection with the administration of such contracts or grants shall be given to Indians; and
> >
> > (2) preference in the award of subcontracts and subgrants in connection with the administration of such contracts or grants shall be given to Indian organizations and to Indian–owned economic enterprises as defined in section 1452 of this title.

The plaintiff contends that the grant here, being "for the benefit of Indians", invoked this section.

The plaintiff does not dispute that the position of tutor-counselor was given to a person whose qualifications were reasonably found to be superior to his own. His contention is that, as long as he was qualified for the position, he was entitled to the appointment regardless of the qualifications of others, because he was the only person of Indian heritage applying for the job. This position utilizes the concept of "Indian" preference as it was employed in a directive issued by the Commissioner of Indian Affairs in June 1972, pursuant to 25 U.S.C. § 472.[2] The constitutionality of this directive, and the statute which it implemented was challenged

---

[2] 25 U.S.C. § 472 (1970) provides:

"The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed, without regard to civil–service laws, to the various positions maintained, now or hereafter, by the Indian Office, in the administration of functions or services affecting any Indian tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions."

before the United States Supreme Court in *Morton v. Mancari,* 417 U.S. 535, 541, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974).

The directive stated that the policy of the Bureau of Indian Affairs would be to grant a preference to qualified Indians not only, as before, in the initial hiring stage but also in the situation where an Indian and a non–Indian, both already employed by the BIA, were competing for a promotion within the bureau.

Appellees in that action, who were non–Indian employees of the BIA at Albuquerque, contended that the so–called Indian preference statutes were repealed by the Equal Employment Opportunity Act of 1972 (42 U.S.C. § 2000e(b)) and that they deprived them of property without due process of law, contrary to the Fifth Amendment. They contended that enforcement of the new policy would place them at a disadvantage in competing for promotion and training programs with Indian employees, thus subjecting them to discrimination and denying them equal employment opportunities.

The Court of Appeals had held that the 1972 act worked an implied repeal of the Indian preference statutes. The United States Supreme Court reversed. It noted that the federal policy of giving preference to Indians *in the Indian service* dates back as far as 1834 and has as its purpose to "give Indians a greater participation in their own self–government; to further the Government's trust obligation toward the Indian tribes; and to reduce the negative effect of having non–Indians administer matters that affect Indian tribal life." (Footnotes omitted.) *Morton,* at 541–42. The overriding purpose of the 1934 act, the Court said, was to establish machinery whereby Indian tribes would be able to assume a greater degree of self–government, both politically and economically. One of the primary means by which self–government would be fostered and the bureau made more responsive was to increase the participation of tribal Indians in the BIA operations. In order to achieve this, the Court said, it was recognized that "some kind of preference

and exemption from otherwise prevailing civil service requirements was necessary." *Morton,* at 543. The goal of the Congress was to effect the gradual replacement of non-Indians with Indians within the bureau. Displacement of non-Indians was an inevitable concomitant. The Court held that this strong legislative policy, enunciated in specific legislation, survived the enactment of the Equal Employment Opportunity Act of 1972. It noted that Title 7 of the Civil Rights Act of 1964, 78 Stat. 253, was the first major piece of federal legislation prohibiting discrimination in private employment, 42 U.S.C. § 2000e-2(a). 42 U.S.C. § 2000e(b) expressly excluded "an Indian Tribe" from the act's definition of an "employer".

Section 2000e-2(i) reads:

> Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

The Court said that this exemption revealed a clear congressional recognition of the "unique legal status of tribal and reservation-based activities." *Morton,* at 546. The exemptions, it said, revealed a clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed. When the Congress extended the general antidiscrimination machinery to federal employment in 1972, it in no way modified the private employment preferences provided for in the 1964 act, and it would be anomalous to conclude that they were not intended to be equally available when the employer was the federal government. Furthermore, the Court noted that 3 months after Congress passed the 1972 amendments, it enacted two new Indian laws, requiring that Indians be given preference in government programs for training teachers of Indian children, and that the act evidenced no affirmative intent to erase the preferences

that previously had coexisted with antidiscrimination laws. The Court found that the two acts were reconcilable, the Indian preference statute being a specific provision applying to a very specific situation and not out of harmony with the antidiscrimination law.

Turning to the claim of denial of due process, the Court said that resolution of the issue turned on the

> unique legal status of Indian tribes under federal law and upon the plenary power of Congress . . . to legislate on behalf of federally recognized Indian tribes. The plenary power of Congress to deal with the special problems of Indians is drawn . . . from the Constitution [and] provides Congress with the power to "regulate Commerce . . . with the Indian Tribes," and . . . to make treaties.

*Morton,* at 551–52. The Court said that literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA single out for special treatment a constituency of tribal Indians living on or near reservations. The Court refused to characterize the preference as a racial one. Rather, it said, the preference was an employment criterion reasonably designed to further the cause of Indian self–government and to make the BIA more responsive to the needs of its constituent groups. It was directed to participation by the governed in the governing agency.

> The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion. . . . In the sense that there is no other group of people favored in this manner, the legal status of the BIA is truly *sui generis.* Furthermore, the preference applies only to employment in the Indian service. The preference does not cover any other Government agency or activity, and we need not consider the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations. Here, the preference is reasonably and directly related to a legitimate, nonracially based goal. This is the principal characteristic

that generally is absent from proscribed forms of racial discrimination.

(Footnote omitted.) *Morton,* at 554. The Court concluded that the preference was reasonable, as applied there, and rationally designed to further Indian self–government and was therefore not a violation of due process.

We have discussed this case at some length because it affords the most significant guide available to us in approaching the plaintiff's contentions with respect to Indian preference and racial discrimination. Two other federal cases dealing with problems of Indian preference are cited in *Morton v. Mancari, supra.* They are *Freeman v. Morton,* 499 F.2d 494 (D.C. Cir. 1974), holding that 25 U.S.C. § 472 (the same statute involved in *Morton*) required that preference be given to Indians in making promotions and lateral transfers, and *Mescalero Apache Tribe v. Hickel,* 432 F.2d 956 (10th Cir. 1970), *cert. denied,* 401 U.S. 981, 28 L. Ed. 2d 333, 91 S. Ct. 1195 (1971), holding this statute inapplicable to reductions in force. The opinion in the latter case reveals that the Bureau of Indian Affairs has not always ascribed an inflexible meaning to the term "Indian preference". There the BIA had, by regulation, adopted a policy of according Indian preference where there were reductions in force, but only when Indians and non–Indians were in the *same* tenure subgroup. In other words, an Indian employee was not given preference over a non–Indian having greater tenure.

In none of these cases was the meaning of the term "Indian preference" explored. While it is evident that in the cases involving employment in the Bureau of Indian Affairs, the term was understood to mean that if an Indian met the minimum qualifications for a position, he must be given preference over non–Indians, regardless of how well qualified, it must be kept in mind that the United States Supreme Court's approval of that preference was confined to the unique setting of the bureau itself, or of Indian activities on or near reservations. It recognized that were it to be applied outside those settings, a serious question of

racial discrimination would arise. Furthermore, the courts decided these three cases under a statute worded differently from 25 U.S.C. § 450e(b). 25 U.S.C. § 472 makes no allowance for discretion in the granting of preferences, but rather provides that "[s]uch qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions."

25 U.S.C. § 450e(b), on the other hand, provides that contracts, subcontracts, grants, and subgrants shall require "to the greatest extent feasible" preferences shall be given. It seems obvious to us that this provision permits a recipient of a grant, in determining whether the awarding of a preference is feasible, to take into account other conditions of the grant.

Here, one of the express conditions of the grant was that the school district utilize the best available talent and resources. The purpose of the grant was to improve the learning abilities and opportunities of Indian children. Nowhere in the act authorizing the grant did Congress express a finding that this service could best be rendered by persons of Indian heritage, irrespective of their training, experience and other capabilities.

█ The preference provided for in the Indian Self–Determination Act is accorded not only where a grant is made to Indian organizations, but also where it is made "for the benefit of Indians". 25 U.S.C. § 450e(b). If this phrase is read to mean that where, as here, a grant is made for the benefit of one group of Indians (Indian children), a preference must be granted to another group (Indian teachers), it will defeat one of the most important conditions of the grant—the utilization of the best talents and resources available. We do not conceive this to have been the congressional intent. Moreover, this preference provision in 25 U.S.C. § 450e(b) is a general law. It applies to contracts, and grants generally, whereas 20 U.S.C. §§ 241aa–ff is a special law, providing for grants for specific purposes and upon specified conditions. The rule that the specific must control the general applies here. *State v.*

*Adlington–Kelly,* 95 Wn.2d 917, 631 P.2d 954 (1981).

Furthermore, the grant itself contained no provision requiring the school district to prefer Indian applicants over better qualified non–Indians. The United States Supreme Court has recently held that a grant is a contract, and the federal government cannot impose conditions which are not set forth unambiguously in the grant itself. *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 67 L. Ed. 2d 694, 101 S. Ct. 1531 (1981). Had this grant contained a condition that the school district award preference to Indians over better qualified non–Indians, the conflict with the requirement that the district utilize the best talents and resources available would have been obvious.

Here, the district, with the apparent concurrence of the Superintendent of Public Instruction, sought to give effect to the right of Indian preference, while still adhering to its commitment to utilize the best talents and resources available, by restricting the preference to instances where an Indian and a non–Indian were equally qualified. This, it appears to this court, is the best it could do consistent with its duties under the grant and its obligations as administrator of the schools within the district.

It also avoids the specter of racial discrimination which the United States Supreme Court has indicated would arise if the BIA concept of Indian preference were applied outside the "unique setting" of that bureau and Indian reservations environs.

We conclude therefore that the trial court erred in holding that the plaintiff was entitled to be given preference over a better qualified applicant in filling this position.

We turn next to the issues involving state law.

The hiring of certificated personnel in this state is governed by statutes and regulations. RCW 28A.67.070 provides:

> No teacher . . . or other certificated employee, holding a position as such with a school district, . . . shall be employed . . . unless he is the holder of an effective teacher's certificate or other certificate required by law or

the state board of education for the position for which the employee is employed.[3]

RCW 28A.70.005 declares that the state board of education shall establish, publish and enforce rules and regulations determining eligibility for and certification of personnel employed in the common schools of this state, including certification under certificates or permits as the board shall deem proper or as otherwise prescribed by law. This provision gives the board authority to require more than one certificate for a given position, and it is the evident intent that the prescribed certificates must be held by anyone hired for that position.

Under WAC 180–79–125, counselors fall within the category of educational staff associates. This section sets forth the educational requirements for certification. Other provisions pertaining to requirements for certification include WAC 180–79–130(1), 180–79–170(1), and 180–79–180.

In *Kimball v. School Dist. 122,* 23 Wash. 520, 63 P. 213 (1900), this court reversed a jury verdict in favor of a plaintiff who sued for breach of a written contract to hire her as a teacher for the school year. The statute in effect at that time required a teaching certificate, as does the present law. The evidence showed that the plaintiff had held a 1–year certificate which expired in August preceding the beginning of the school year. She failed to pass the examination for a renewal, but did succeed in obtaining a temporary certificate, good for 2 months. When she presented herself with this certificate, the directors of the school district refused to hire her. This court held that it was incumbent upon the plaintiff to prove that at the time she offered to teach, she was duly licensed to teach for the full term of 9 months. It said that if the plaintiff had been

---

[3]In *Champion v. Shoreline Sch. Dist. 412,* 81 Wn.2d 672, 504 P.2d 304 (1972), we held that the words "other certificate", as used in this section, refer to certificates, in addition to a teaching certificate, required of one who is certified as a teacher. The respondent falls within that category, being required to have both a teaching certificate and a counselor's certificate in order to perform the duties of the position for which he applied.

allowed to enter upon the discharge of her contract, had taught 2 months and had failed to get a new certificate, she could have recovered for that period, not on the contract, however, but because an implied contract arose as to the 2 months. This court said:

> As a condition precedent to the plaintiff's right of recovery in this action, she should have shown that when she offered her services to the appellants she was qualified to teach, under the laws of this state, for the full nine months contracted for.

*Kimball,* at 528.

And in *Kester v. School Dist. 34,* 48 Wash. 486, 93 P. 907 (1908), also a suit upon a written contract to teach, it was held that the plaintiff was unqualified to perform the duties required under the contract because he held no certificate or other authority to teach at the time he presented himself and offered to enter upon the performance of his duties. He did have in his possession a letter from a county superintendent stating that his papers were sufficient to entitle him to a temporary certificate, and that such certificate would be granted upon application as provided by statute.

This court held that such a letter was not the equivalent of a temporary certificate. It said:

> Where a certificate is required as a condition precedent to the right to enter upon an employment or exercise a privilege, a promise to grant the certificate on application will not satisfy the requirements of the law.

*Kester,* at 488.

*Kimball v. School Dist. 122, supra,* was cited with approval in *Sherwood v. Wise,* 132 Wash. 295, 232 P. 309 (1925), where this court held that an assignee of an unlicensed architect could not recover for services rendered pursuant to contract, the contract being illegal and void.

Since in each of these cases the applicant did not have a certificate at the time for performing the contract, the court did not consider what the effect would be if an applicant were to obtain a certificate before the time for commencing his teaching duties. Upon this subject there is a split of

authority, some cases holding that where the teacher does not possess the requisite license or certificate at the time the contract for services is entered into, the fact that he subsequently obtains it is of no avail, unless a new contract, express or implied, is thereafter entered into between the parties. Others hold that it is sufficient where the teacher obtains a certificate before he enters on the term of his employment, or before the time for the commencement of his duties. 78 C.J.S. *Schools and School Districts* § 161(b) (1952); 68 Am. Jur. 2d *Schools* § 140 (1973); Annot., *Failure To Procure Occupational or Business License or Permit as Affecting Validity or Enforceability of Contract*, 30 A.L.R. 834, 890, 894–98 (1924); 118 A.L.R. 646, 666–67 (1939).

The trial court here recognized that the plaintiff did not have the required certification at the time this appointment was made or before the beginning of the school year. However, it concluded that because the director of the program allowed the plaintiff to apply for the position and the board, the advisory committee, and school officials considered his application, the defendant was estopped to assert the statutory requirement.

An examination of the plaintiff's testimony reveals that he was aware of the statutory requirement and of the insistence on the part of the Superintendent of Public Instruction that he procure such a certificate if he was to be hired for the year 1979–80. He testified, nevertheless, that the administrator of the grant told him that the document which he had obtained from Eastern Washington University recommending to the Superintendent of Public Instruction that he be certified as a counselor was a sufficient qualification for the school district to accept his application for the position. Nowhere in his testimony do we find any assertion that the administrator or other employee or official of the district promised him that he would be hired. The evidence is that he was told that they would be looking for the best qualified person.

In order to establish estoppel, it must be shown that the

defendant made an admission, statement or act which was inconsistent with his later claim; that the plaintiff relied thereon; and that the plaintiff would suffer injury were the defendant allowed to contradict or repudiate his earlier admission, statement, or act. *Harbor Air Serv., Inc. v. Board of Tax Appeals*, 88 Wn.2d 359, 560 P.2d 1145 (1977); *Finch v. Matthews*, 74 Wn.2d 161, 443 P.2d 833 (1968).

While the doctrine may, in a proper case, be applied to a municipal corporation such as a school district, it cannot operate where the act of the municipal corporation is ultra vires and void. In determining what acts fall within this category, the court must distinguish those acts which are done wholly without legal authorization or in direct violation of existing statutes, from those acts which are within the scope of the broad governmental powers conferred, granted or delegated, but which powers have been exercised in an irregular manner or through unauthorized procedural means. *Finch v. Matthews, supra. Accord, State ex rel. Shannon v. Sponburgh*, 66 Wn.2d 135, 401 P.2d 635 (1965).

As we have seen, a school district has no authority to hire a person for a certificated position unless that person holds the required certificate. The doctrine of equitable estoppel cannot operate to defeat that statutory requirement. However, as we understand the trial court's decision, it did not hold that the plaintiff could have assumed the duties of the position without first obtaining a counselor's certificate, but rather that the district, through its agents, had, by permitting him to apply before he obtained the certificate, estopped themselves from asserting that he would not have been qualified when the term began. The evidence was that the certificate could have been obtained within 20 days after application was made. On the day of the interview, only 15 days remained before the opening of school. However, for purposes of this opinion, we will assume that, had the plaintiff been accepted for the position, he would have immediately applied for a certificate and would have obtained it prior to the beginning of the school year. We find it unnecessary to decide whether the doctrine of equi-

table estoppel can properly operate in these circumstances and, for purposes of this opinion, will assume that it can.

■ Even so, the fact that the plaintiff would have been properly certified on the day his duties commenced, had he been hired, does not entitle him to the benefit of the doctrine of *Peters v. South Kitsap Sch. Dist. 402,* 8 Wn. App. 809, 509 P.2d 67 (1973). In *Peters,* the Court of Appeals, Division Two, said that where a teacher is nonrenewed for financial reasons, he must be offered any job for which he is qualified, which becomes available before "termination of his contract." Implicit in that opinion is a requirement that the teacher be in good standing, that is, fully certified at the time of the nonrenewal and qualified for the position at the time the opening occurs. The plaintiff met neither of those requirements.

Under the plaintiff's contract for the year 1978–79, he was employed for one "school year". RCW 28A.01.020 declares that the school year shall begin on the first day of September and end on the last day of August. Nevertheless, the school district maintains that the school year, for purposes of the *Peters* doctrine, should terminate on the day that a teacher completes 180.5 days of service, as is provided in the collective bargaining agreement. We need not resolve that question in this action.

The plaintiff did not have the required counselor's certificate at the time he was nonrenewed nor on the last day of August 1979, and was therefore not qualified for the position within the duration of his contract, assuming it terminated on August 31 rather than in June, as the plaintiff argues. Consequently, he was not entitled to the benefit of the *Peters* rule. Since this disposes of the plaintiff's claim that the *Peters* doctrine was violated, it is unnecessary to inquire into the significance of the plaintiff's signing a waiver of continuing contract rights, or the question whether *Peters* applies to the termination of a contract financed by federal grant and subject to federal statutory and regulatory requirements, as is the case here, a significant requirement being that the school district utilize the

best available talents and resources.

The collective bargaining contract relied upon by the plaintiff in another of his theories of recovery requires that the district shall

> in all instances employ certificated employees who are properly credentialed in accordance with applicable state laws, Washington Administrative Code, and by other such requirements as specified by the office of the State Superintendent of Public Instruction.

Article 5, section F of the contract provides a procedure to be followed when, in the judgment of the board, a reduction in staff is necessary. Employees nonrenewed because of a reduction in staff, under this provision, are to be placed in an "employment pool" available for reemployment for any positions which become available and for which they qualify until all of the employees have been rehired. The benefits of this provision are afforded only to persons holding the "proper certificate". The plaintiff, not holding the proper certificate at the time he was nonrenewed or when the position became available, cannot claim relief under this contract section. As in the case of the *Peters* doctrine, the fact that he would have had a certificate on the day school began is not sufficient to satisfy its requirements.

We also note, as did the trial court, that section F by its terms applies only where there is a multiple reduction in force and does not purport to apply to isolated nonrenewals.

There remains the question of whether RCW 49.60.180 was violated. That section makes it an unfair practice for any employer to refuse to hire any person because of such person's race or national origin, unless based upon a bona fide occupational qualification. There is no evidence that the plaintiff was denied this position because of his race. All the evidence was that the district chose the person having the most impressive qualifications, and that it made the appointment with the approval of the Central Valley Native American Advisory Committee. The Superior Court correctly dismissed this claim for relief.

The judgment in favor of the plaintiff is reversed. Insofar as it rejected the claims of the plaintiff, the judgment is affirmed.

BRACHTENBACH, C.J., STAFFORD, UTTER, DOLLIVER, WILLIAMS, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DIMMICK, J., concurs in the result.

Reconsideration denied August 17, 1982.